THE FOURTH FAIRLAND, INC., PLAINTIFF, v. TOWNSHIP OF HAZLET, DEFENDANT.

Tax Court of New Jersey

April 2, 1980.

Lasser, Hochman, Marcus, Guryan & Kuskin for plaintiff (Harold A. Kuskin appearing).

Wilentz, Goldman & Spitzer for defendant (Robert J. Cirafesi appearing).

ANDREW, J. T. C.

Plaintiff seeks relief from an assessment allegedly in excess of fair market value for the tax years of 1975, 1976, 1977 and 1978 and relief from alleged inequality in assessment for the tax year 1975 alone. The assessment as originally set by the Assessor of Hazlet Township for the tax years in question was as follows:

| 1975 | | 1976, 1977, 1978 | |
|---|---|---|---|
| Land | $ 434,900 | Land | $ 660,000 |
| Improvements | 1,040,100 | Improvements | 1,911,700 |
| Total | $1,475,000 | Total | $2,571,700 |

The Monmouth County Board of Taxation affirmed the assessment for each of the tax years.

At the outset of the trial it was stipulated that the question of discrimination or inequality in assessment was not in issue for the tax years of 1976, 1977 and 1978. This was based primarily on the fact that a revaluation had been achieved by defendant effective for the tax year 1976.

The subject consists of 16.5 acres of land which is improved with a one–story brick and block store building containing 120,484 square feet and a one–story block store building containing 4,940 square feet. The property is known as 3140 Route # 35, Hazlet Township, New Jersey, and is designated as Block

233, Lot 1, on the tax map of the township. The buildings, constructed in 1962, have concrete block walls, masonry foundations, brick veneered facade and a steel structural frame which supports a steel deck roof. The main building has forced air heating and central air–conditioning, while the smaller building has five suspended gas–fired space heaters, overhead doors and air–conditioning for approximately 2,000 square feet. Both buildings are considered to be in fair to good condition. The balance of the site is paved with asphalt and provides lighting for drives, parking and loading.

The subject has a frontage of 1,176 feet on Route 35 and is zoned business–highway (B–H) which permits retail uses, offices, shopping centers and similar uses.

Each party relied upon the testimony of one valuation expert. The taxpayer's expert stated that he considered the three approaches to value but did not use the cost approach because of the age of the improvements which caused considerable difficulty in estimating physical depreciation, functional and economic obsolescence. He relied upon the income approach as the most significant indication of value. He also considered two sales of other property but did not use the sales to provide an estimate of value but rather as a check on his income approach to insure there was no wide divergence between value produced by capitalization of income and the sales. It was his opinion that the market data approach is not as reliable as the income approach when dealing with commercial properties such as the subject because the sales involved the assumption by purchasers of existing mortgage financing which could increase selling prices. The taxpayer's expert estimated that the value of the subject for each tax year was $1,625,000, allocating $660,000 to land and $965,000 to improvements.

The expert for the taxing district also eschewed the cost approach, preferring to rely upon the income approach which indicated a value to him of $2,508,500 (land $660,000, improvements $1,848,500) and the market approach which produced a value estimate of $2,737,000 (land $660,000, improvements

$2,077,000). He correlated his value estimates and concluded that the value of the subject for each of the tax years was $2,600,000 (land $660,000, improvements $1,940,000).

The areas in which the two experts differed in their income approaches to value was in estimated economic rental and in the capitalization rate. The taxpayer's expert relied on seven rentals, six of which were not located in the area of the subject property. He stated that he felt that true comparability could only be achieved if he restricted his consideration to comparable leases involving "second user type of occupants" as opposed to "build to suit" leases. This was on the basis that a "build to suit" store meets all of the specifications of the tenant while the "second user" often requires the tenant to "make do." He also felt that the second user has the benefit of the first tenant's experience as to location and can gauge his rent accordingly. Because of this he did not give much weight to a lease of a "built to suit" store adjacent to the subject (the only comparable he used within the area of the subject) and relied upon other "second user" leases in West Orange, Turnersville, North Plainfield, Union, Hackettstown and South Plainfield, New Jersey. He stated that he had to consider a wide geographic area because of the paucity of rental information available in "second user" stores. These "second user" rentals indicated to him an economic rental for the subject of $2 a square foot for the main building and $3.50 a square foot for the second smaller building. The township's expert relied primarily upon the lease of Hazlet Plaza, a shopping center consisting of two store buildings containing a total of 81,558 square feet which was constructed in 1969. This comparable was situated several hundred feet from the subject across Route 35. He also knew of, but did not include in his appraisal, a lease involving Bradlees, Inc. at 1105 Route 36, Hazlet, N. J., which confirmed in his mind his opinion as to economic rent. Based on the first–mentioned lease, the expert opined that a fair market rent for the subject would be $2.20 a square foot net (without the landlord's share of taxes), or $2.80 a square foot if the landlord's share of real estate taxes were added back.

He gave little credence to the "second user" concept advanced by the taxpayer's expert, on the basis that the subject improvements represented an "elemental building" which would require very little adjustment for another user. He felt that this would not be a determining factor as to what rent would be paid, nor did he feel that a first user's experience would guide a second tenant as to what an appropriate rental would be.

 Value in a store property is to a large extent based essentially on people, quantitatively and qualitatively. The economy of a locality is an important factor in income–producing properties such as the subject. *Friedman, Encyclopedia of Real Estate Appraising* (3 ed. 1978), at 423. Consideration must be given to the income potential of the neighborhood, the potential of the neighborhood population, trends of growth in the trade area and the element of competition. *Id.* at 441, 442. See also *American Institute of Real Estate Appraisers, The Appraisal of Real Estate* (7 ed. 1978), at 105, 106 and 107. Of primary importance would be numbers of families and incomes of these families. I do not believe that distant rentals can be adjusted to apply to the subject without demographic analyses and adjustments for trade competition in each of the areas under consideration. I therefore find that the taxpayer's expert's comparable rentals outside the area of the subject fail to contain sufficient adjustments in order to reflect an economic rental for the subject. Properties such as the subject are not fungible goods and cannot be treated as such in order to determine value. I find that the economic rental determination by the expert for the township was sound, reasonable and cogent, and therefore accept $2.20 a square foot net as constituting fair market rent for the subject ($2.80 a square foot including taxes).

The second area wherein the experts differed in their utilization of the income approach was with regard to the proper capitalization rate. The expert for the taxing district derived his capitalization rate from the sale of the Hazlet Plaza Shopping Center on June 30, 1975. The purchase price and net

income indicated an overall rate of 10.14%; therefore he used a 10% rate for the subject and allocated 8% for return on investment and 2% for recapture (future depreciation). The taxpayer's expert felt that the proper capitalization rate should be 12% (9% return on investment and 3% recapture or future depreciation) using the building residual method of income capitalization. He did indicate, however, that properties are not bought and sold in the market by means of a building residual method of valuation. This technique is normally used when the value of the site is known. Here, both experts have accepted the assessed value for the tax years of 1976, 1977 and 1978 as constituting the appropriate land value. Once the land value is known, a proper interest rate return on the land value is then determined and the amount is deducted from net operating income. *The Appraisal of Real Estate, supra* at 405, 406. The residual income, attributable to the improvements is then capitalized at a rate that combines a proper rate on the investment plus a rate for capital recovery (recapture or future depreciation). *Ibid.* This produces the value of the improvements based on earning capacity which, when added to the land value, constitutes the property value estimate. *Ibid.* He used the building residual method only because he felt it found acceptance in local property tax matters in the former Division of Tax Appeals.

However, the taxpayer's expert opined that his *overall* capitalization analysis provided a more realistic reflection of the market. He assumed that the capital required to purchase the subject would come from two sources—a mortgage loan for the maximum amount obtainable at the best terms and an equity investment which would demand a rate commensurate with other investment opportunities. He estimated a 75% mortgage at 9½% interest for 22 years which produced 8.14%, along with a 25% equity investment at 10% return which produced 2.50%, and these when added together gave rise to an overall rate of 10.64%. His estimated value by using both capitalization techniques did not vary materially. The court is not satisfied by the proofs that the overall capitalization procedure used by the taxpayer's expert truly reflects what investors in the commer-

cial real estate market do relative to the sale and purchase of property such as the subject. The court is mindful of the admonition sounded by Chief Justice Weintraub when he said, "In any event, it is not for the trier of facts to decide abstractly what return an investor should want; the inquiry relates to what investors in property of this kind in fact do demand and do obtain in deals with willing sellers." *New Brunswick v. State Division of Tax Appeals*, 39 *N.J.* 537, 551, 189 *A.*2d 702 (1963). However, until more persuasive proofs are adduced as to what investors do demand and the manner in which such demands can be calculated, it is felt that the traditional building residual technique is more reliable relative to value estimate.

I find that I must reject the capitalization rate suggested by the township's expert because the sale upon which he relied was not sold on an all–cash basis. I find that the existing mortgage financing (mortgage for $1,150,000 at 8%) influenced the sale, not only as to the price that was paid but the capitalization rate which the sale price indicated. Even the township's expert agreed that existing favorable financing which could be assumed by a purchaser would induce an investor to pay a higher price than he would otherwise pay.

I find and determine that the capitalization rate that should be utilized in this matter is 11% and the method followed by both experts, i.e., the building residual analysis should be used. The 11% represents a return of 8.5% and an allowance of 2.5% for recapture of capital. The allowance for return is reasonable when one considers the rates of return available on alternative investments during the applicable periods. The recapture rate of 2.5% (40 years economic life) is amply justified by the age and condition of the subject; therefore a capitalization rate of 11% (return on investment 8.5%, recapture 2.5%) will be adopted.

The vacancy factor allowed by each expert was 5%, which I find fair and reasonable under the circumstances. In addition, the estimate of expenses by the experts did not differ substantially therefore I will accept the estimate of expenses advanced

by the township's expert at $23,600, which I also find to be fair and reasonable. There was no dispute as to the value of the land since each expert accepted the land assessment as being correct at $660,000.

I have determined by means of the income approach that the value of the subject property is as follows:

| | |
|---|---:|
| Estimated economic rent, 125,424 square feet at $2.20 a square foot (net of real estate taxes) | $ 275,900 |
| Less vacancy and collection loss at 5% | 13,795 |
| Effective annual income | $ 262,105 |
| Less operating expenses | 23,600 |
| Net operating expenses | $ 238,505 |
| Deduct income to land ($660,000 x 8.5%) | 56,100 |
| Net income to improvements | $ 182,405 |
| $182,405 capitalized at 11% (8.5% + 2.5% rounded) | 1,658,200 |
| Add value of land | 660,000 |
| Total Value | $2,318,200 |

It should be noted that I capitalized the net income before taxes; I therefore did not include the tax rate within the capitalization rate. This procedure was determined to be consistent with *New Brunswick v. Division of Tax Appeals, supra,* in *Humble Oil & Refining Co. v. Englewood Cliffs,* 71 *N.J.* 401, 365 *A.*2d 929 (1976).

Having determined true value to be $2,318,200 for all tax years in question, the question of discrimination in assessment for the tax year of 1975 must be addressed. I find that the value as stated produces a ratio of 63.63% of assessed value to true value for 1975 ($1,475,000 ÷ 2,318,200). The evidence submitted by plaintiff for the tax year of 1975 indicated that the common level of assessments which existed in the taxing district was 58.57%. This was not refuted by the taxing district. The

difference between the common level of 58.57% and the ratio of assessed to true value of plaintiff's property is not substantial (8.6%); I therefore find that there was no discrimination in assessment for the tax year 1975. *In re Appeal of Kents 2124 Atlantic Ave., Inc.*, 34 N.J. 21, 166 A.2d 763 (1961); *Piscataway Associates v. Piscataway Tp.*, 73 N.J. 546, 554, 376 A.2d 527 (1977).

Based on the determinations herein, the petition for 1975 will be dismissed and the assessment for 1976, 1977 and 1978 shall be:

| | |
|---|---|
| Land | $ 660,000 |
| Improvements | 1,658,200 |
| Total | $2,318,200 |

The Clerk of the Tax Court shall enter judgments accordingly.