LASSER, P.J.T.C.
Taxpayer contests the 1985 local property tax assessment on its department store property located at the Rockaway Town Square Mall. The property is designated as Block 11001, Lot 4, and consists of a 9.32-acre parcel of land on which is erected a two-story building containing 154,000 square feet. The 1985 assessment on the property is:
Land $1,398,000
Improvements 9,515,000
Total $10,913,000
Taxpayer filed a complaint directly with the Tax Court pursuant to N.J.S.A. 54:3-21. In 1985 there was a revaluation of all property in Rockaway Township. The parties stipulated that *405 the 1985 common level of assessment in Rockaway Township is 100% and that the tax rate is $2.43 per $100 of assessed value.
Rockaway Town Square Mall is a super-regional shopping center with four major department stores grouped around a two-story, central mall containing approximately 188 satellite retail stores. Each of the major department stores (Sears, Roebuck and Company, Bamberger’s, J.C. Penney and Hahne and Company) owns the land under its store building and adjacent parking areas, and each built its own building. Although all of the department store buildings are connected to the two mall levels, the mall itself is independently owned.
The Hahne building was constructed in 1979 and, in addition to two retail selling levels, contains a penthouse which houses the heating, ventilating and air-conditioning systems. The Hahne store, smallest of the four major department stores, has the smallest storage area, the least desirable location (at the rear of the shopping center) and a sales volume per square foot that is substantially less than that of Bamberger’s or Sears. The store consists of 136,500 square feet of retail space, 2,500 square feet of office space and 15,000 square feet of warehouse area. The building is steel frame with exterior walls of cement block covered with sprayed aggregate. The interior walls are painted and papered dry wall, with metal and dry wall partitions with steel studs. The heating, cooling, lighting and plumbing systems are of good quality. The interior finish is superior to that of Sears and J.C. Penney and only slightly inferior to that of Bamberger’s. The building contains one passenger elevator and two escalators.
The appraisal expert for the taxing district described the Hahne store as follows:
The subject property is located in the rear of the mall. Visual exposure from Mt. Hope Avenue is the worst of the four anchors. The two main entrances to the common area portion of the mall are located at the front of the mall which is also where the majority of the parking is done. This affords the subject the least amount of visual exposure of the four anchors. It is this appraiser’s opinion that the Sears, the Penney’s and the Bamberger’s location, as far as exposure visually and the pedestrian walking patterns (end turn arounds), is considered superior overall to the Hahne’s anchor.
*406 Each party produced one real estate appraisal expert. Both experts testified to their opinion of the market value of the property as of October 1, 1984 by use of the income approach. The appraisal expert for the taxing district also used the cost approach as a check on his value by the income approach, but relied almost exclusively on the income approach. The appraisal expert for the taxpayer opined that the building would probably cost $40-$45 a square foot to build, and the cost estimated by the expert for the taxing district as of October 1, 1984, before deducting depreciation, was approximately $58 a square foot.
Taxpayer’s expert valued the 9.32 acres of land by relying on six comparable land sales. Four of the comparables were sales of land for the four anchor stores in the subject shopping center, one was a sale to J.C. Penney of land in the Woodbridge Center Shopping Mall, upon which J.C. Penney constructed its department store, and one was a sale to Fortunoff of property in Wayne, New Jersey, in the neighborhood of the Willowbrook Shopping Center. These six sales ranged in time from 1975 to 1981 and in price from $6,157 an acre in October 1975 to $129,739 an acre in 1981. Taxpayer’s expert concluded from these sales that the land value of the subject is $100,000 an acre as of the October 1, 1984 assessing date.
The taxing district’s expert relied on the same six land sales, adjusting each of them for time by adding 8% appreciation per year,[1] resulting in indicated prices for the subject land ranging from $130,000 to $174,300 an acre. This expert was of the opinion that the subject land value on the assessing date was $150,000 an acre.
The income approach testimony of both experts was based on the same 14 retail store leases. It was from an analysis of these leases that taxpayer’s expert concluded that the annual net rental value of the subject property is $5 a square foot, and *407 the taxing district’s expert found the rental value before vacancy and expenses to be $8.66 a square foot.
The taxing district’s expert compared the relationship of anchor store rents to satellite store rents in five shopping centers located in Watchung, Union, Manalapan, East Brunswick and Ocean County. He found the anchor store rents to be approximately 50% of the satellite store rents. The 1984 satellite store rents collected in Rockaway Town Square Mall amounted to $17.25 a square foot. Because these rents were paid under leases entered into prior to 1984, this expert added 5% to the rents to reflect a time adjustment, and arrived at an economic rent for Rockaway Mall satellite stores of $18.11 a square foot. He concluded that the anchor store rents should be 50% of $18.11, or $9.05 a square foot. Combining his anchor-satellite analysis with his indicated economic rent of $8.66 based on the adjusted 14 comparable rents, he concluded that the economic rent for the subject property is $8.75 a square foot.
A summary of the follows: experts’ income approach conclusions
Taxpayer’s Expert Taxing District’s Expert
Gross income N/A $ 1,347,500 (154,000 sq.ft. X $8.75/sq.ft.)
Less vacancy N/A - 13,475 (1%)
Effective gross income N/A $ 1,334,025
Less expenses N/A - 66,701 (5%)*
Net income $ 770,160 (154,032 sq.ft. X $5/sq.ft) $ 1,267,324
Capitalization rate 11.5% 11.5%
Value (rounded) $ 6,700,000 $11,020,200
*408 The experts agreed that there have been no recent sales or leases of major department store properties in New Jersey, and that, therefore, they were obliged to derive their opinions of the rental value of the subject property from an analysis of leases of 14 major retail store tenants in shopping centers. The leases, which ranged in time from 1979 to 1985, were of seven Caldor stores, four K-Mart stores, one Stop-n-Shop, one Brad-lees and one James way store. All of the stores were in small strip shopping centers, with the exception of the Caldor store in Monmouth Mall, an older, enclosed shopping center in Eaton-town. These stores ranged in size from 60,000 to 198,912 square feet. Some of the stores were newly-constructed and some were in older buildings. The base rentals ranged from $3.43 to $6.01 a square foot. All of the rents were gross, with the exception of the Westwood K-Mart store, which was a $3.63 net rental. Taxpayer’s expert testified that a Caldor, K-Mart or Bradlees-type tenant would pay as much rent to lease the Hahne store in Rockaway Mall as Hahne would pay, while the expert for the taxing district opined that Hahne would pay slightly more.
Taxpayer’s expert converted all of the comparable rentals to a net basis by subtracting from each rental the real estate taxes that the landlord was obligated to pay under the lease, and $.03 a square foot for structural repairs and $.10 a square foot for roof repairs where these repairs were the landlord’s obligation. He then made an adjustment of V2 of 1% a year to adjust the ages of the comparable leased buildings to the age of the subject building. He made no adjustment for location, stating that there is no difference in value between shopping center buildings located in North Jersey and South Jersey, or those in rural, suburban, city or highway locations. He adjusted the comparable leases for time to reflect the difference between the date each lease was entered into and the subject October 1, 1984 assessing date. His time adjustment was at the rate of a 7V2 increase in value a year until October 1, 1983. He made no time adjustment for the period October 1, 1983 to October 1, 1984. No adjustment was made by taxpayer’s *409 expert for leases with periodic, stepped-up rents. He concluded that the 14 comparable rents reflected a net rent for the subject property of $5 a square foot as of October 1, 1983 and October 1, 1984.
Based on the same 14 comparable rents, the taxing district’s expert concluded that the rental for the subject, when adjusted for time, size and real estate taxes, was $4.76 a square foot, but he stated that this figure required further square foot rental adjustments for the following:
Base rent $4.75/sq.ft.
(1) quality of interior and exterior + construction (+20%) .90 [sic]
(2) surrounding satellites (enclosed mall) + (+20%) .90 [sic]
(3) financial enhancement of ownership (+5%) + .24
(4) common area contribution (flat rate) + 1.15
(5) general geographic location (+10%) + .48
(6) specific mall location (+5%) + .24
Total economic rent indicated 3.66/sq.ft.
The taxing district’s expert added 20% to the rental value because of the better quality of the subject’s interior and exterior construction, although he conceded that the property would rent for only a slightly higher rental as a Hahne store (because of its higher quality interior finish) than it would as a Caldor, K-Mart or Bradlees store. I conclude that some consideration should be given to the fact that the Hahne store has a superior interior finish, and find that there should be a 10% increase for this.
The taxing district’s expert was of the opinion that 20% should be added to the rental value for “surrounding satellites” because the subject property is in a modern, enclosed mall instead of an older, enclosed mall or a strip shopping center. I conclude that consideration should be given to the fact that the *410 subject property is in a modern, well-located, enclosed mall and find that there should be a 10% increase in the rental value for the superior quality and location of the Rockaway Mall.
The taxing district’s expert added a 5% factor for financial enhancement of ownership. He was of the opinion that there are tax advantages to ownership that are not available to a tenant. However, he did not quantify these tax benefits. Taxpayer’s expert opined that the tax benefits were reflected in the 11.5% capitalization rate. I agree that the tax benefits are reflected in the capitalization rate, and for that reason, I find that there should be no adjustment for the financial enhancement of ownership. The taxing district’s expert added 10% for general geographical location and 5% for specific mall location. I find that there is no justification for adding 5% for specific mall location since Hahne’s location is the poorest in the mall. A factor for the superior location of the Rockaway Mall is included in my 10% modern, well-located enclosed mall adjustment.
The taxing district’s expert made a substantial adjustment for common-area maintenance. His rationale was that some of the comparable rentals (although he did not identify them) included common-area maintenance fees in addition to rent. The expert calculated the pro rata share of the common-area maintenance cost to all tenants in the subject mall at an average of $1.65 a square foot, deducted $.50 a square foot for the cost to Hahne for maintenance of the subject property’s parking areas and concluded that $1.15 should be added to the adjusted, comparable rents to reflect the amount that would have to be paid for common-area maintenance if the subject property were on a comparable basis with comparable rental properties whose tenants pay for common-area maintenance. Although there may be some logic to the taxing district’s expert’s rationale, there is not sufficient evidence of the amount charged tenants in the comparable rentals for common-area maintenance to determine how much, if anything, should be added as an adjustment for common-area maintenance and *411 how much should be subtracted from that figure for maintenance of the subject property’s parking area.
I have not relied on the taxing district’s expert’s analysis of the relation of anchor store rents to satellite store rents because of his lack of support for the rentals used in this analysis, the difference in quality of the comparable anchor store buildings and the over-generalization of his assumption. Satellite stores and anchor stores vary in age, size, location and quality, and a 50% rule of thumb cannot be applied without considering these differences.
The crucial factual issue in the income approach to value is the economic rental value of the subject as of October 1, 1984. The experts’ opinions of the rental value of the subject are based on 14 leases. Although none of these leases are directly comparable to the subject, they are as close as the experts could come in finding a basis for the economic rent of the subject. Adjustments made to these lease rentals for the age of the buildings, location, date of lease and other factors that differentiate the lease of a discount store in a strip shopping center from that of a major department store in a modern, super-regional mall are inexact. However, in accordance with the mandate of Glen Wall Assocs. v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985), I find that the proofs in this case are sufficient to enable me to arrive at a market value for the subject property even though there are no directly comparable sales or rentals.
The taxing district’s expert made no adjustment in his comparable rental analysis for the age of the buildings, stating that such an adjustment was not necessary because of continued maintenance and remodeling. I accept this reasoning and therefore find it unnecessary to correct taxpayer’s expert’s age adjustment to reflect the three-year difference between the actual construction date of the subject building (1979) and the expert’s use of 1976 as the construction date, and I also note that the xk of 1% a year figure translates into a very minor difference in taxpayer’s expert’s conclusion. I accept taxpay *412 er’s adjusted square foot net rental of $5, but increase this figure by 20% to account for the higher quality of the subject’s interior finish, the surrounding satellites, the enclosed mall and the general geographical location. I conclude that the net rental of the subject property is $6 a square foot. This yields a total net rental of $924,000, which is capitalized at 11.5% to yield a value of $8,034,783. My use of a net, rather than a gross rental makes it unnecessary for me to consider the expenses deducted by the taxing district’s expert.[2]
In allocating this value between land and improvements, I adopt the revaluation value of $150,000 an acre. The taxing district’s expert’s testimony with respect to the rate of appreciation of land values is more persuasive than taxpayer’s expert’s testimony. The latter testified that there was no appreciation in land value from October 1, 1983 to October 1, 1984, a statement difficult to believe in view of general economic trends and the evidence in this case that the Rockaway Mall is successful and the retail sales volume is increasing.
I have considered the experts’ cost estimates as a check on the values they derived from the income approach, but give most weight to the income approach. The appraisal expert for taxpayer did not prepare a cost approach value, but during the course of the trial he estimated the cost to reproduce the building on the October 1, 1984 assessing date at $40-$45 a square foot. The appraisal expert for the taxing district testified that the Marshall and Swift cost service estimated the cost of this type of building at between $50 and $70 a square foot. In his cost approach, the taxing district’s appraisal expert estimated the undepreciated value of the building at $56 a square foot. At an estimated cost of $50 a square foot, the total cost for 154,000 square feet would be $7,700,000. Deducting 12% for depreciation and obsolescence yields $6,776,000, to which must be added the $1,398,000 land value ($150,000 per *413 acre X 9.32 acres) for a total of $8,174,000, which indicates to me that my value obtained by the income approach is reasonable.
I therefore conclude that the value of the subject property as of October 1, 1984 is:
Land $1,398,000
Improvements 6,636,783
Total $8,034,783
The Clerk of the Tax Court is directed to enter judgment reducing the assessment to $8,034,783.

 Compare taxpayer's expert's time adjustment of lVi% a year in adjusting comparable leases, infra.

 Management 2%; Structural maintenance reserve 3%.

 The taxing district’s expert's gross rental of $8.75 becomes a net rental of $8.23 after deducting his vacancy and expense figures ($1,267,324 4- 154,000 sq. ft.).