ANDREW, J.T.C.
In this case plaintiff, J.C. Penney Company, Inc., seeks a reduction in its local property tax assessments for tax years 1982 through 1985 inclusive. Plaintiff-taxpayer contends that the assessment for each of the tax years of 1982 and 1983 is in excess of fair market value, and for all four tax years plaintiff further asserts that the property is the subject of inequality in assessment and seeks application of an appropriate assessment ratio. At the outset of the trial the parties stipulated that the following chapter 123 (N.J.S.A. 54:51A-6) ratios would be applicable in this proceeding:
Average Ratio Upper Limit Lower Limit
1982 60% 69% 51%
1983 54% 63% 45%
1984 53.21% 61.19% 45.23%
1985 46.02% 52.92% 39.12%
The property involved in this controversy is known and designated as Block 47, Lot 82 on the tax map of Lawrence Township and is commonly identified as 4190 Quaker Bridge *477 Mall. It was assessed for each of the tax years in question as follows:
Land $ 738,700
Improvements 5,755,400
Total $6,494,100
Direct review of the assessment for all tax years has been sought in this court pursuant to N.J.S.A. 54:3-21.
Plaintiff through its appraiser, Richard A. Kulman, contends that the fair market value of the subject property was $5,680,-000 as of October 1, 1981, $6,090,000 as of October 1, 1982 and $7,685,000 as of October 1, 1983 and October 1, 1984. With an application of the appropriate chapter 123 ratio to these values plaintiff asserts that proper assessments would be $3,408,000 for 1982, $3,288,600 for 1983, $4,089,200 for 1984 and $3,536,-700 for 1985.
Defendant through its expert appraiser, Richard M. Chaiken, contends that the fair market value of the subject property as of the pivotal assessment dates was $11,186,000 for 1982, $11,827,000 for 1983, $12,815,000 for 1984 and $14,096,000 for 1985. It is further defendant’s position that plaintiff’s property was not the subject of unequal assessment treatment and therefore the assessment for each tax year should be affirmed.
The parties are in substantial agreement regarding the description of the property. The subject is an irregularly-shaped parcel of land, stipulated by the parties to be 14.892 acres in size, which forms an integral part of a “super” regional shopping center known as the Quaker Bridge Mall located at the intersection of U.S. Route 1 and Quakerbridge Road in Lawrence Township, midway between Princeton and Trenton. The mall of which the subject is but a part consists of four major department stores (one of which is the subject) and approximately 125 satellite-retail establishments.
The development of the Quaker Bridge Mall was chronicled in the comprehensive opinion of former Judge Conley of the Tax Court in Lawrence Associates v. Lawrence Tp., 5 N.J. Tax 481 (Tax Ct.1983) and need not be repeated here. Suffice it to say *478 that the mall constitutes a shopping center of approximately 1,300,000 square feet of building area sited on a 100-acre tract of land. The four major department stores located in the complex are Bamberger’s, Hahne’s, Sears and the subject of this proceeding, J.C. Penney. The J.C. Penney department store consists of a two-level structure with a mechanical penthouse constructed in 1976 and contains, as stipulated by the parties, 162,571 square feet of space distributed as follows:
first level — 77,055 square feet
second level — 75,436 square feet
penthouse — 10,080 square feet
Also involved in this proceeding is a free-standing automotive repair building, constructed in 1976, and identified by the parties as a tirt, battery and accessories structure (hereinafter TBA). This is a one-story masonry and steel improvement consisting of a store and a 12-bay garage. The parties stipulated that the area of this building was 14,344 square feet.
The experts are in agreement that the highest and best use of the subject property is its present use as a department store and automotive center in a super regional shopping mall. The site is zoned S-C, shopping center commercial district, and the present use is in conformity with Lawrence Township’s zoning requirements. It should be noted that the township zoning ordinance permits only three shopping centers, one of which is the Quaker Bridge complex, in the entire township.
Plaintiff’s expert, Kulman, predicated his estimates of value for the four tax years in question essentially upon an income approach to value because, in his opinion, a potential purchaser would buy a facility such as the subject for the income produced. Although Kulman employed a cost approach, his emphasis was clearly on his income analysis. He did not utilize a direct sales comparison approach because he could not find any verifiable arm’s-length sales of department stores.
Defendant’s expert, Chaiken, also relied predominantly upon an economic analysis even though he, as did Kulman, employed a cost approach. Similarly, Chaiken did not develop a direct *479 sales comparison approach because of a lack of useful market data upon which to predicate such an analysis.
The resolution of a local property tax case requires, in many instances, a determination of which one or more of the three traditional valuation methodologies may be the most reliable under the circumstances. The reproduction cost method of valuation produces a significant indication of value when the improvements are new and physical, functional and economic depreciation are objectively measurable. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) 444. The cost methodology may result in serious error when depreciation in all forms is not objectively measurable. Therefore, most courts have utilized this method as the only approach in those limited instances in which no other method of valuation would yield an economically realistic value. 1 Bonbright, Valuation of Property, 175-176. This pragmatic position is reflected in the modern appraisal practice of relegating the cost approach to a secondary role because cost may not effectively reflect market conditions. O’Flaherty, “Cost Approach to Value,” Friedman, Encyclopedia of Real Estate Appraising (3 ed. 1978) 66-67.
In this case the parties at the outset of the trial agreed to submit each expert’s cost approach analysis based solely on the information contained in each expert’s appraisal report. There was no direct testimony nor cross-examination on any aspect of either expert’s cost approach analysis. Presumably this was done because the parties recognized that the approach that would be of preponderant influence in this case was the income approach to value. This is evidenced by the fact that each expert concluded his final estimate of value at the same value estimate derived through that expert’s income approach. The appraisal reports of both appraisers demonstrated that a typical investor would only be interested in the value result produced by an income approach.
My review of the cost approach analysis of each expert leads me to the conclusion that the cost approach is not a reliable *480 indicator of value and is of little utility in this case. For example, Kulman’s depreciation analysis was grounded on the difference between “the net rental the property would have to obtain to justify the cost of construction” and his estimation of the fair market net rental the property could actually command in the market. The difficulty with this type of analysis is that it is grounded upon the expert’s estimation of fair market rental which is precisely at issue in the expert’s economic approach. The cost analysis adds nothing to the expert’s income approach since both are dependent upon an appropriate estimation of economic rent. If Kulman’s estimation of economic rent is inappropriate, logically his income, and also cost, approach will provide an incorrect result.
On the other hand, relative to depreciation in his cost analysis, Chaiken’s appraisal report simply sets forth a physical depreciation allowance of 4.5% for 1982, 5% for 1983, 6% for 1984 and 7.5% for 1985. There is no supporting data nor explanation in the report for these subjective estimates.
Thus I find, as the experts have advocated, that an economic analysis is the most persuasive approach in the present case. Hence, the issue in this case turns on whether an appropriate assessment can be determined for each tax year based on an income approach method of valuation.
Of course, the initial step or starting point in an economic analysis is an estimation of market or economic rent for the property under consideration. Market or economic rent has been defined as “[t]he rental income that a property would most probably command on the open market as indicated by current rentals being paid for comparable space as of the appraisal date.” Boyce, Real Estate Appraisal Terminology, (rev. ed. 1982) at 160; emphasis supplied; Glen Wall Associates v. Wall Tp., 99 N.J. 265, 274-275, 491 A.2d 1247 (1985).
Not only did the two experts differ in their estimates of market rent but it was this difference and the manner in which *481 each expert derived his estimate of market rent that was the crux of the entire case.[1]
Since the department store portion of the subject is owner-occupied, plaintiffs expert, Kulman, ascribed a fair market rental derived from his examination of 14 allegedly comparable rental properties in what he considered to be the subject’s competitive area. He explained that, in his search for comparable market rentals, he could not find any timely rentals by traditional department stores within a super regional mall. Therefore, he expanded his search to include potential tenants who would lease department-store space in a mall such as Quaker Bridge. He discovered that on August 2, 1982 Caldor’s (characterized by defendant as a “discount store”) had leased a 108,000-square foot space within a super regional shopping center known as the Monmouth Mall in Eatontown for an initial five-year term at $5 a square foot. This space was originally leased to Montgomery Ward in 1960 and subsequently leased to Alexander’s department store. Failing to discover any other leases of department store space within super regional shopping centers, he turned to other tenants that he considered to be potential alternative users or occupiers of such space within a mall.
Based on his hypothesis that major tenants in smaller strip-shopping and regional centers would locate in a super regional mall, if given the opportunity, he utilized 13 additional leases of properties throughout the entire State that ranged in size from 60,000 square feet to 198,912 square feet and in lease dates from April 2, 1981 to May 1985. The lessees included Caldor’s in six instances, K-Mart in four instances, Stop-n-Shop, Brad-lees and Jamesway. The base rentals of all of Kulman’s leases, including Caldor’s in the Monmouth Mall, had an unadjusted range of $3.43 a square foot to $6.01 a square foot. Some of the comparable leases had gross rentals while others were on a *482 net basis, which latter term was defined by Kulman to mean “everything paid by a tenant.” In order to put the leases on common ground he adjusted all of them to a net basis which produced a range of rentals from $3.30 a square foot to $5.87 a square foot.
Although Kulman did not make this court aware of all of his specific adjustments or the mechanics of his adjustments he indicated that he adjusted the comparables for age, time and investment tax credits, where applicable, which produced the following ranges of rentals for the tax years indicated.
Tax Year Range
1982 $3.29 to $5.35
1983 $3.56 to $5.78
1984 $4.09 to $6.65
1985 $4.09 to $6.65
Kulman concluded that the owner of the subject could obtain fair market rentals of $4 a square foot for 1982, $4.25 a square foot for 1983 and $5 a square foot for 1984 and 1985 for the department-store space within the mall.
With regard to the rental value of the TBA, Kulman relied upon the lease executed during the period of time under review in this case between J.C. Penney and Firestone Tire & Rubber Co., the current tenant, at $5.75 a square foot. He indicated that he had spoken to the principals involved in the lease and concluded that it was an arm’s-length transaction in which contract rent fairly represented market net rent. The estimated net rental was then processed to a capital value by means of the expert’s capitalization rate.
The taxing district’s expert, Chaiken, did not agree with Kulman’s opinion as to market rent in one major respect. Chaiken was of the opinion that location was of paramount importance in a value estimation of the subject while Kulman did not believe that location made any difference based on his observation of the rentals being paid in different shopping centers.
*483 Because Chaiken felt that location was of primary significance, when he looked at competitive areas some distance from the subject, he attempted demographic analyses to reflect the differences but found that there were so many debatable incidents that he could not make the required locational adjustments. Therefore, he chose an alternate approach which he felt would not require a locational adjustment.
Chaiken indicated that he found that a relationship exists between the rent paid by a major department store and the rents paid by the satellite stores within the same shopping center. It was his notion that the essential difference between the major or anchor store space and that of a satellite store is size. When the rentals are compared a ratio of rentals between the two can be derived which is nothing more than an analysis of paired data sets in which rentals are paired to identify and separate the reason for the difference in market rent. As previously stated, Chaiken attributes this difference primarily to size. In order to substantiate this view Chaiken relied upon three sets of data. He indicated that J.C. Penney leased an anchor store in 1976 in the Ocean County Mall in Toms River at $3.43 a square foot while at the same time the average satellite store rentals were $7.25 a square foot. This was perceived by Chaiken as indicative of the fact that major department stores would only pay 47% of the rental paid by the satellites ($3.43 -r $7.25 = 47%).
The second example set forth by Chaiken was a Bradlees in a strip-shopping center that was leased at $4.81 a square foot while the only satellite rental was $8.80 a square foot. This indicated to him a ratio of 55% ($4.81 -f- $8.80 = 55%) or that a major tenant would only pay 55% of the rental paid by the satellite.
The third set of data supplied by Chaiken was that of a J.C. Penney lease in the West Belt Mall in Wayne. There J.C. Penney had leased space at the rate of $3.30 a square foot while the average rent of the satellite stores was $6.85 a square foot. This indicated to Chaiken that a major department store *484 would only pay 48% of the then prevailing satellite stores’ rentals ($3.30 h- $6.85 = 48%).
Taking these three market indications of the relationship between major department-store rentals and satellite-store rentals along with some 30 to 50 different analyses which he chose not to reflect in his appraisal report, Chaiken concluded that anchor-store rentals generally are about 53% of satellite-store rentals.
The next step for Chaiken was to establish the satellite-store market rents in Quaker Bridge Mall as of the pivotal assessment dates involved in this case. He relied on four leases in the mall, Contemporary Furs, 1372 square feet, Koenig Art Emporium, 1462 square feet, Merle Norman Cosmetics, 595 square feet, and Roy Rogers, 4407 square feet, to achieve average estimated fair market rentals of $16.50 a square foot for 1982, $17.50 a square foot for 1983, $19 a square foot for 1984 and $21 a square foot for 1985.
To these average estimated satellite rentals he applied his anchor department store-satellite store ratio of 53% to derive an economic or market rent estimate for the department-store space in question here as follows:
Tax Year Market Rent
1982 $ 8.75 a square foot ($16.50 X 53%) [2]
1983 9.25 a square foot ($17.50 x 53%)
1984 10.00 a square foot ($19 x 53%)
1985 11.00 a square foot ($21 x 53%)
Insofar as the TBA was concerned, Chaiken estimated the market rental for this improvement by adjusting his estimate of market rent for the department-store space by means of a plus 15% net adjustment. He adjusted his market rental for the department-store space upward 35% because the TBA was much smaller and adjusted downward 20% because of the *485 quality of the department-store space as compared to the TBA. This produced market rentals for the TBA of $10 a square foot for 1982, $10.50 a square foot for 1983, $11.50 a square foot for 1984 and $12.50 a square foot for 1985.[3]
Chaiken permitted a minimal deduction of 1% for vacancy and collection losses and minor expense deductions for management at 4%, insurance at $7,600 and reserves for exterior maintenance at $12,000. He then capitalized the total net operating income with his selected capitalization rate to achieve the value estimations previously expressed.
Plaintiff contends that the major department store-satellite store ratio analysis of defendant’s expert should be completely ignored by this court. On the other hand, defendant asserts that plaintiff has failed to present sufficient competent evidence to overcome the presumption of correctness of the original assessment. Alternatively, defendant argues that even if plaintiff’s proofs are sufficient to overcome the presumption of the validity of the assessment, plaintiff has failed to carry its burden of persuasion by a fair preponderance of the evidence.
In regard to plaintiff’s contention, at trial plaintiff emphasized the fact that there did not appear to be any recognized appraisal authority that acknowledged Chaiken’s major department store-satellite store adjustment technique. This fact, if it be one, in and of itself is not persuasive. In rejecting an attack on a particular appraisal method the Appellate Division provided as follows:
There is no single doctrinaire approach to the methodology of the valuation of real property or any phase thereof. An expert may properly bring all his knowledge and experience to bear on the critical issue of the price for which, in his judgment, the subject property will sell between parties willing but not compelled to sell or buy, as the case may be. If, in the appraiser’s experience, the general market for parcels of industrial property of the particular type and in the general area involved is characteristically expressed in terms of price per square foot of usable floor space ... we see no rational basis for rejecting as groundless the use by the witness as one of his approaches to the valuation of *486 the subject property what he has learned as to how much similar properties are selling for on such a building — square-foot price basis. [Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 72, 208 A.2d 153 (App.Div.1965)]
In the field of local property taxation “[t]here can be no rigid rule, the answer depends upon the particular facts and the reaction to them of experts steeped in the history and hopes of the area.” New Brunswick v. Tax Appeals Division, 39 N.J. 537, 544, 189 A.2d 702 (1963).
More to the point, however, is plaintiff’s argument that Chaiken’s ratio analysis is deficient for lack of supporting market data. Relative to Chaiken’s first set of data, viz., the J.C. Penney rental in the Ocean County Mall as compared to the average satellite rental in that mall, there was no proof offered of the actual satellite rentals. Moreover, the ratio postulated by Chaiken was for 1976. There was nothing to indicate that this ratio continued through to the period of 1982 to 1985. These deficiencies were also evident with regard to Chaiken’s third set of paired data, i.e., the 1974 J.C. Penney rental in the West Belt Mall in relation to the satellite rentals at that mall at the same time. The expert failed to provide the actual rentals for the satellite stores to support the putative ratio advanced. Additionally, the ratio reflected the relationship that may have existed in 1974. There was nothing offered to demonstrate that the same proportional relationship continued to the relevant 1982 to 1985 time period.
As for Chaiken’s second set of paired data, the ratio was derived from two leases in a strip-shopping center, those of Bradlees and one satellite store. These two lease transactions, in a totally different commercial environment from the subject, simply do not provide the support necessary to establish the proposition advanced by defendant’s expert. There would of necessity have to be sufficient repetitions of a percentage relationship between major department-store rentals and satellite rentals in order to demonstrate that it is simply a size adjustment technique. There must be sufficient quantities of data in order to permit the postulated conclusion to have any validity in a statistical sense. Although the expert indicated *487 that he had reviewed 30 to 50 paired sets of data, such analyses were conspicuously absent from his appraisal report.
In this regard it is noteworthy that the same appraisal technique advanced by Chaiken was also proposed by another appraisal expert in the Tax Court proceeding of Hahne & Co. v. Rockaway Tp., 8 N.J.Tax 403 (Tax Ct.1986). In rejecting the adjustment method Judge Lasser of this court stated:
I have not relied on the taxing district’s expert’s analysis of the relation of anchor store rents to satellite store rents because of the lack of support by this expert for the comparable anchor store and satellite store rentals used in the analysis, the difference in quality of the comparable anchor store buildings and the over-generalization of his assumption. Satellite stores and anchor stores vary in age, size, location and quality, and a 50% rule of thumb cannot be applied to all without considering these differences. [Id. at 411]
In short, I am constrained to reject Chaiken’s estimate of market rent for the subject department-store space. By the same token, since his estimated market rentals for the TBA were derived by adjusting his estimates of the department-store rentals, I cannot accept those estimates either. This is not to say, however, that the postulated adjustment technique is not an acceptable method of adjusting market data. It simply means that more persuasive proofs must be adduced in support of the methodology.
I turn now to a consideration of defendant’s arguments that plaintiff’s proofs fail to overcome the presumption of correctness or, alternatively, fail to sustain plaintiff’s burden of persuasion.
As previously indicated plaintiff filed direct appeals with the Tax Court. In a proceeding in this court original assessments are presumed to be correct and the presumption is overcome only by the introduction of sufficient competent evidence to enable the court to determine the fair assessable value of the property. Pantasote Co. v. City of Passaic, 100 N.J. 408, 412-43, 495 A.2d 1308 (1985); Riverview Gardens v. North Arlington Bor., 9 N.J. 167, 175, 87 A.2d 425 (1952). Once the presumption of the correctness of the original assessment has been overcome in such a manner, this court must then appraise the evidence and determine the true value of the *488 subject property and its appropriate assessment. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 75, 208 A.2d 153 (App.Div.1985); Rodwood Gardens v. Summit, 188 N.J.Super. 34, 38-39, 455 A.2d 1136 (App.Div.1982). The requisite standard of proof once the presumption of correctness has been overcome is that of the preponderance of the evidence. N.J.S.A. 2A:84A-5; Evid.R. 1(4); WCI-Westinghouse, Inc. v. Edison Tp., 7 N.J. Tax 610, 617 (Tax Ct.1985), aff’d o.b. per curiam — N.J. Tax-(App.Div.1986).
In making its argument that plaintiff’s proofs are legally insufficient, defendant contends that location is of critical significance in estimating rental values of department stores and that an appraiser must give appropriate consideration to such variables as trade-area demographics, geographic extent of the trade area, ages and income levels of the trade-area population, and trade-area competition in order to make meaningful adjustments for locational differences between the comparable rentals and the subject property. Since Kulman, plaintiff’s appraisal expert, did not specifically analyze and assess such factors, defendant advances the position that plaintiff’s appraisal is unreliable and legally insufficient. As support, defendant relies upon the Tax Court opinion in Fourth Fairland, Inc. v. Hazlet Tp., 1 N.J. Tax 254, 260 (Tax Ct.1980) and urges that demographic analyses and adjustments for trade competition in each area under consideration relative to the rental values of retail stores are categorical imperatives, the absence of which requires dismissal of plaintiff’s complaints.
Defendant’s reliance on this court’s opinion in Fourth Fair-land is misplaced. The language used by this court, in that opinion, in urging the importance of demographic analyses and adjustments for trade competition in each of the areas under consideration was in the context of the relative worth of proffered comparable rentals within the trade area of the subject property as opposed to comparable rentals outside the trade area of the retail store property under consideration in that case. Id. at 259-260. This court was persuaded to accept the *489 contract rental of a comparable retail store within the trade area as more reflective of economic rental for the subject than contract rentals outside the trade area of the subject without such demographic analyses. It was simply a matter of relative worth or weight to be given the evidence adduced in that case.
Moreover, even assuming that defendant’s interpretation of Fourth Fairland is correct it must be noted that that opinion was written approximately five years prior to the opinion of our Supreme Court in Glen Wall Associates v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985). In Glen Wall Associates the Court, in rejecting a strict application of the “presumption of correctness” doctrine, expressed the view that the volume of information required to support an appraisal expert’s opinion must be kept within realistic and practical limits in light of the litigation expenses to the parties and the cost to the judicial system. Id. at 280-281, 284, 491 A.2d 1247. There must be “reasonable limits on what is to be expected of a litigant in presenting his case through the use of an expert.” Id. at 284, 491 A.2d 1247.
As previously indicated plaintiff’s expert, Kulman, presented 14 leases of allegedly comparable properties, and gave preponderant influence to the only rental he had within a super regional mall. This was the Caldor lease in the Monmouth Mall in Eatontown which was dated August 2, 1982 and provided a rental of $5 a square foot for 108,000 square feet for the first five years of a 25-year lease. Kulman’s final rental values for the subject reflect the significant weight that he ascribed to this lease, and since this comparable rental fell within his adjusted range of rentals he was confident of his income approach values.
Although the allegedly comparable rentals offered by Kulman do not possess identical characteristics as to time, physical qualities and location, they are sufficiently similar in physical, functional and economic aspects to permit comparisons to be made within the guidelines of Glen Wall Assocs. v. Wall Tp., supra.
An expert should be expected to support his opinion with as much documentation as necessary, but within realistic and practical limits. Courts should *490 always be mindful of the time and money both taxpayers and municipalities must spend litigating these actions. [99 N.J. at 277, 491 A.2d 1247]
The extent of data that this court should require to support an estimate of market rent for a particular property depends in large part upon the availability of sufficiently comparable rentals. If the leased properties offered as comparables are sufficiently competitive to the subject to be considered a reasonable substitute they should be considered. The differences can be appropriately accounted for by appraisal adjustments. This court can then evaluate the adjustments or the lack of adjustments and apply its own knowledge and expertise to make an appropriate determination. Id. at 279-280, 491 A.2d 1247.
Kulman’s market rent analysis, while sufficient to overcome the presumption of correctness, cannot, however, be accepted in its entirety. A trial judge as a factfinder is not bound by the valuation opinion of an expert appraiser but may accept so much of an expert’s opinion as appears sound or reject or adopt all of it. Middlesex Cty. v. Clearwater Village, Inc. 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978), certif. den. 79 N.J. 483, 401 A.2d 239 (1979); Atlantic City v. Atlantic Cty Bd. of Tax, 2 N.J. Tax 30, (Tax Ct.1980); aff’d 4 N.J. Tax 685 (App.Div.1982), certif. den. 93 N.J. 250, 460 A.2d 659 (1983). One reason that I cannot accept Kulman’s values in their entirety is that, as previously mentioned, his rental comparisons did not reflect the mechanics of his adjustments.[4] This deficiency is highlighted by the fact that in deriving his land value as part of his cost approach analysis he provided an adjustment grid which reflected both the items for which adjustments he deemed necessary and the percentages ascribed to each. In regard to land values this enabled the court to review not only *491 the appropriateness of the adjustment but, additionally, the amount.
A second reason why I cannot accept Kulman’s values in their entirety is that there was one factor for which Kulman made no adjustment, that being the item considered the most significant by Chaiken, to wit, location. Kulman felt there was no difference in the location of his comparables either in relation to each other or in relation to the subject. This conclusion was based solely on his observation of rentals being paid in the different shopping centers.
There is no dispute that location does influence value. It is also well-settled that the commercial real estate market does not operate with mathematical precision, and therefore it may be necessary to indicate a range of rental values within which an expert must select the most appropriate under the circumstances.
Here I find that plaintiffs expert did not give sufficient consideration to the qualitative differences in the locations of the comparable facilities in relation to the subject property which is clearly within a superior commercial environment. Nor do I believe that Kulman gave sufficient consideration to the physical attributes of the subject in relation to the properties which he deemed comparable. Therefore, I conclude that the market rent for the subject department store space should be at the upper limit of the range of adjusted rentals provided by plaintiffs expert. Cf. Hahne & Co. v. Rockaway Tp., supra at -.
The upper limit is selected because of the superior location of the subject and its excellent physical qualities in relation to the comparables. Thus, based on the record the market rentals for the department-store space are deemed to be as follows:
*492 Tax Year Market Rental
1982 $5.35 a square foot
1983 5.78 a square foot
1984 6.65 a square foot
1985 6.65 a square foot
Application of these square foot rentals results in the following total market net rent for the department store.
Tax Year Total Rental
1982 $ 869,755 ($5.35 x 162,571 square feet)
1983 939,660 ($5.78 X 162,571 square feet)
1984 1.081.097 ($6.65 X 162,571 square feet)
1985 1.081.097 ($6.65 X 162,571 square feet)
I find that this conclusion comports with the rental of $5 a square foot paid by Caldor for a 108,000-square foot space within the Monmouth Mall, concededly, the most comparable of Kulman’s 14 leased properties. With appropriate adjustments for time (Caldor’s lease was negotiated prior to August 2, 1982 while the tax years here span the period of 1982 to 1985), location (a comparison would reveal the superiority of the subject’s location in Lawrence Township as opposed to Eaton-town), age (the subject was constructed in 1976 while the comparable was constructed in 1960, and Caldor is the third lessee of the space) and size (the subject at 162,571 square feet is larger than the comparable at 108,000 square feet), the upper limit of Kulman’s rental range provides an appropriate market rental for the subject department-store space within the context of the record produced in this case.
Insofar as the rental value of the TBA is concerned I find that the lease of the TBA between J.C. Penney and the Firestone Tire & Rubber Co. reflects the best evidence of market rental for that improvement. Inasmuch as the lease was negotiated and became effective in the 1983 tax year somewhat in the middle of the time period here in controversy (October 1, 1981 to October 1, 1984) I see no need to adjust the rental for time. Thus, Kulman’s estimate of market rent for *493 the TBA will be adopted. That provides a yearly rental of $82,478 for each year under review.
The total market rent for the subject would then be as follows:
Tax Year Total Rental
1982 $ 952,233
1983 1,022,138
1984 1.163.575
1985 1.163.575
Utilizing the agreed upon capitalization rate of 12.25% yields the following rounded values:
Tax Year Value (Rounded)
1982 $7,773,400
1983 8,344,000
1984 9,498,600
1985 9,498,600
Pursuant to N.J.S.A. 54:4-26 it is necessary for administrative purposes to assign separate values for each component of a total assessment, i.e., land and buildings. There was a dispute in this case relative to the value of the land. Plaintiffs expert ascribed a value of $110,000 an acre for tax years 1982 and 1983 and a value of $132,000 an acre for 1984 and 1985. These value estimates were based on an analysis of four sales of allegedly comparable land within the vicinity of the Quaker Bridge Mall.
In contrast, defendant’s expert relied on a sale in 1976 of land adjoining the then proposed mall which sold for $125,000 an acre which he trended with an average rate of increase of 10% a year. His sole support for the trended increase was the ratio studies of the Director of the Division of Taxation. This procedure produced estimated land values of $200,000 an acre for 1982, $220,000 an acre for 1983, $240,000 an acre for 1984 and $260,000 an acre for 1985.
Since defendant’s land value estimates were not based on current sales of vacant land while plaintiffs expert presented a cogent analysis of current land sales with adjustments to *494 reflect the perceived differences between the comparables and the subject I will accept the land values advanced by plaintiffs expert for this case for the administrative purpose of separating the land and improvements components of the entire assessment. The rounded land values will be $1,640,000 for 1982 and 1983 and $1,965,000 for 1984 and 1985.
The total values as determined for each of the tax years produce a ratio of assessment to true value as follows:
Tax Year Ratio of Assessment to True Value
1982 83.54% ($6,494,100 + $7,773,400)
1983 77.83% ($6,494,100 ^ $8,344,000)
1984 68.37% ($6,494,100 + $9,498,600)
1985 68.37% ($6,494,100 -r- $9,498,600)
It is clear that an application of the chapter 123 average ratio is in order for each tax year since the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit (1982 — 69%, 1983 — 63%, 1984 — 61.19%, 1985— 52.92%) of the common level range for each tax year. Therefore the assessable values (rounded) shall be as follows:
Tax Year Average Ratio Total Rounded Assessment
1982 60% $4,664,100 ($7,773,400 X 60%)
1983 54% $4,505,800 ($8,344,000 X 54%)
1984 53.21% $5,054,300 ($9,498,600 X 53.21%)
1985 46.02% $4,371,300 ($9,498,600 X 46.02%)
The Clerk of the Tax Court is directed to enter judgments as follows:
*495 1982 1983
Land $ 984,000 Land $ 885,600
Improvements 3,680,100 Improvements 3,620,200
Total $4,664,100 Total $4,505,800
1984 1985
Land $1,045,600 Land $ 904,300
Improvements 4,008,700 Improvements 3,467,000
Total $5,054,300 Total $4,371,300

 The parties stipulated that the court should apply a capitalization rate of 12.25% to whatever net operating income the court deemed appropriate.

These market rentals represent rounded approximations advanced by the taxing district’s expert.

 These market rentals represent rounded approximations advanced by the taxing district’s expert.

 In this regard The Appraisal of Real Estate, supra, provides:
In most appraisals, some percentage adjustments are made, and the format helps a reader of an appraisal report to follow the rationale of the adjustments. In deriving and applying adjustments, appraisers should always state the percentage relationship of the subject to the comparable. • [At 320]