KUSKIN, J.T.C.
I
Background
Plaintiff seeks a reduction in the 1996 local property tax assessments on four lots in the Township of Wayne. Defendant has counterclaimed seeking an increase in such assessments. Three of the lots under appeal, Lots 1, 2, and 3 in Block 3703, are functionally integrated and constitute a single economic unit operated as an office complex. The complex consists of two buildings containing an aggregate of 546,448 square feet of gross rentable area, and 183.82 acres of land. The fourth lot, Lot 1 in Block 4200, is a parcel of vacant land containing 11.9 acres located across the street from the other three Lots. The 1996 assessments on the four lots were as follows:
Block 3703, Lot 1 Block 3703. Lot 2 Block 3703, Lot 3 Block 4200, Lot 1
Land $24,156,100 $133,900 $811,500 $1,192,400
Improvements $25,893,400 $ 76,000 $ 0 $ 0
Total $50,049,500 $209,900 $811,500 $1,192,400
The aggregate assessment on Lots 1, 2, and 3 in Block 3703 was $51,070,900. The Chapter 123 Ratio for the Township of Wayne for 1996, established pursuant to N.J.SA 54:l-35a(a), was 94.84%. The upper limit of the common level range was 100%, and the lower limit was 80.61%.
*546 This matter was tried before the Honorable Maureen Dougherty for eleven days in October and November 1997. Prior to submission of the parties’ post-trial briefs, Judge Dougherty resigned from the Tax Court, and the matter was reassigned to me. Counsel for both parties consented to my deciding the matter based on my review of the full transcript of the trial proceedings, the exhibits, and the post-trial briefs.
The trial related almost entirely to the valuation of Lots 1, 2, and 3 in Block 3703, and, unless otherwise stated, this opinion discusses only such parcels. Of the 183.82 acres constituting these Lots, approximately 78 acres are either steeply sloped or constitute wetlands. The remaining approximately 106 acres constitute a plateau on which the two existing office buildings, and related improvements, are located. The property has approximately 4000 feet of frontage on the Point View Reservoir, and approximately 1250 feet of frontage on Berdan Avenue which provides access to the site. The parties agreed that only the plateau area is suitable for development. This area contains limited wetland areas and some sloped areas, but the slopes are not as steep as those located within the remaining 78 acres where most of the wetlands are located.
One of the existing office buildings, the Main Building, was constructed in 1962 and consists of: (i) a four story section in an elongated S, or serpentine, shape, approximately 1,000 feet long and 74 feet wide, (ii) a five story executive tower, and (iii) a one story and basement cafeteria. The other building, the West Building, was constructed in 1976 and is a six story structure. After conclusion of the trial, the parties resolved, by stipulation, discrepancies between the determinations of building areas by their respective appraisers. With respect to the Main Braiding, the parties stipulated that: (a) the area of the building is 430,521 square feet; (b) the total above-grade building area (excluding 21,751 square feet of basement area and 31,407 square feet of penthouse area containing mechanical equipment) is 377,363 square feet; and (e) the gross rentable area is 377,363 square feet. With respect to the West Braiding, they stipulated that the area of *547 the building (which also constitutes its gross rentable area) is 169,085 square feet. In addition to the two office buildings, the plateau portion of the site also contains a 9,048 square foot power plant, a pedestrian tunnel and bridge connecting the two buildings, parking lots containing approximately 500,000 square feet of paved area, roadway areas, and a large water tank, as well as other minor buildings.
The property is in the RD-Research & Development zoning district, where the principal permitted uses are office facilities and structures devoted to research and engineering. The maximum permitted building height in the district is “forty (40) feet [three stories],” and the maximum permitted lot coverage is 25%. The height of each of the subject buildings exceeds the maximum under the existing provisions of the zoning ordinance, but the buildings are legally nonconforming.
The property is located in the northern section of Wayne, near the Valley Road/Paterson Hamburg Turnpike corridor, where the majority of the 3.1 million square feet of office space in the Township are also located. Approximately one-half mile from the subject property is the Wayne-MeBride Office Research Center which is developed with corporate headquarters facilities. This section of Wayne also contains Class A and B office buildings, and research and development facilities. The area immediately surrounding the property consists mainly of up-scale residential development. Driving distance from the site to Route 23 is approximately six miles, to Routes 287 and 208 approximately three miles, and to Route 80 approximately eight miles. The roads connecting the site with these highways are local in nature with two or four lanes of traffic.1
*548 The property served as the corporate headquarters for American Cyanamid Company until 1994, when American Home Products (“AHP”) acquired American Cyanamid. The highest number of employees at the complex was approximately 1700.' After AHP’s acquisition, occupancy of the subject buildings decreased so that, by October 1,1995, the valuation date in issue, only approximately 800 employees remained. By November 9, 1996, all employees had left the property, and the buildings were vacant. In January 1995, AHP retained The Garibaldi Group, Inc. to provide advice relating to the disposition of the property. Garibaldi prepared an Alternate Use Study dated April 12, 1995 (the “Garibaldi Study” or the “Study”), which described its purpose as, “to determine the property’s highest and best use and to recommend a disposition strategy.” In order to prepare the Study, Garibaldi retained the services of a residential real estate development consultant, an architect and planner, a construction management company, and a civil and environmental engineer.
The Garibaldi Study described the subject property in detail, including functional inadequacies and deficiencies of the buildings, and then discussed disposition of the property for each of the following uses: (a) residential development, involving the demolition of the existing buildings and construction of approximately 600 to 900 residential units; (b) conversion to senior citizen housing or a life care community; (c) demolition of the buildings and redevelopment of the site for office use; and (d) renovation of the buildings for office use by either a single occupant or multiple tenants. The Study concluded that, while an office use or office development would “in theory” yield the highest price, the likelihood of succeeding in disposing of the property for such use was limited given the then condition of the market and the condition of the buildings. Finally, the Study concluded that, even though redevelopment for residential or life care use would not yield the highest price, those markets were “active and viable.”
*549 In analyzing the suitability of the site for office development, the Garibaldi Study estimated that approximately 1,400,000 square feet of additional office space, in five buildings and three related parking garages, could be constructed, so that the total office area could be expanded to approximately 1,950,000 square feet. The Study contained a drawing showing the potential location on the site of the five buildings and three parking garages. These locations took into account the slopes on the property and the wetland areas on the plateau. The Study assumed that four of the office buildings would contain four stories, and one would contain three and one-half stories, and that each of the parking garages would contain four stories. The Study projected gross sales prices of $14,810,000 for a residential planned unit development, $20,000,000 for senior citizens housing, and $25,000,000 to $30,000,-000 for office development.
The Garibaldi Study’s discussion of the suitability of marketing the two existing buildings for office use includes analyses of the costs of renovating and rehabilitating the buildings to bring them up to modern office standards. These costs included, without limitation, removal of asbestos, removal of escalators and installation of new elevators, replacing existing single-pane windows in the Main Building with double-pane windows, replacing the heating, ventilating and air conditioning systems, and installation of fire sprinklers. The Study estimated the renovation and rehabilitation costs for single tenant use at $16,540,985, including design and engineering costs and a contingency factor. For multiple tenant occupancy, such costs increased to $19,626,366, with the additional costs relating to the installation of new lobbies in the Main Building, installation of a new stair tower in the West Building, and additional design, engineering, construction management, and contingency costs.
On August 8, 1995, AHP retained Garibaldi as the exclusive broker for the property. In November 1995, AHP entered into a contract -with Senior Campus Living to sell the property for use for senior citizen housing. In December 1995, the Wayne Municipal Council informally indicated its disapproval of the zone change *550 required for this use. Senior Campus Living nevertheless filed a use variance application, and Garibaldi orchestrated an intensive public relations campaign to change the Council’s position. In July 1996, however, the Council, by formal vote, rejected the requested rezoning, and the contract with Senior Campus Living was then terminated.
During the pendency of the Senior Campus Living application, Garibaldi devoted very little effort to marketing the property for use as zoned. Garibaldi developed its first, and only, marketing plan for office use in August 1996. This plan was never implemented. At Garibaldi’s suggestion, AHP thereafter offered to sell the subject property as part of a package including office buildings located at 1700 Valley Road in Wayne, containing approximately 68,000 square feet, and 1800 Valley Road in Wayne, containing approximately 56,000 square feet. The asking price for the package was $20,000,000. A Purchase and Sale Agreement for a total purchase price of $16,000,000, of which $5,000,000 was allocated by the Agreement to 1700 and 1800 Valley Road, was signed on November 20, 1996, and closing occurred on February 28, 1997. Additional details of this sale will be discussed below.
II
Highest and Best Use
For property tax assessment purposes, property must be valued at its highest and best use. Ford Motor Co. v. Edison Tp., 127 N.J. 290, 300-01, 604 A.2d 580 (1992). Accordingly, the first step in the valuation process is the determination of the highest and best use for the subject property.
Each appraiser analyzed the property both as vacant and as improved with the existing buildings, and each appraiser concluded that the highest and best use was as so improved. Plaintiffs appraiser described such highest and best use as follows: “multi-tenant office [is] an appropriate use for the existing improvements as of October 1,1995, subject to major renovation and extensive fit-up.” The appraiser also determined that twenty *551 acres of the plateau area were suited for construction of additional office buildings, although there was insufficient market demand to warrant any such construction. The term “appropriate use” does not appear in the appraisal literature. Plaintiff’s appraiser testified that he used this term because the improvements on the property added only marginal value. Although the appraiser testified to a distinction between “appropriate use” and highest and best use, he nevertheless valued the property as improved, and I will assume, for purposes of this opinion, that “appropriate use” is equivalent to highest and best use. Defendant’s appraiser determined that the highest and best use for the subject property, as improved, “is for the renovation of the existing structures for one or two tenants (single users for each building) and the development of the additional land as a corporate office campus.” Although plaintiffs appraiser indicated that the “appropriate use” for the property as improved would be for “multi-tenant office,” he testified that multi-tenant office use could include one tenant for each of the two buildings. As quoted above, the appraiser for defendant also described the highest and best use of the property as including one occupant for each building. Peter D. Blanchard, an executive at Garibaldi who was primarily responsible for preparation of the Garibaldi Study and who qualified at trial as an expert witness in marketing, sales, and brokerage of office properties, testified that multi-tenant use of the Main Building was “impractical in the market,” and that the entire office complex was designed for a single user, although a single user in each building was conceivable. Based on Mr. Blanchard’s testimony and the opinions of the appraisers, I conclude that the highest and best use of the subject property is, as improved, for occupancy by a single tenant in each of the two buildings, and for future construction of additional office/research buildings on the plateau area of the site. In order to complete my highest and best use analysis, I must determine the extent and timing of the future construction. See, Fanning, Grissom, and Pearson, Market Analysis for Valuation Appraisals 341-45 (Appraisal Institute 1994) (describing the importance of timing in a highest and best use analysis.)
*552 As described above, plaintiffs appraiser determined that twenty acres of the plateau area were suitable for construction of additional office space. He rendered no opinion as to building area because he considered additional construction to be “highly speculative” as a result of the absence of market demand. Defendant’s appraiser, based solely on the Garibaldi Study, concluded that an additional 1,400,000 square feet of office and/or research space could be constructed on the property. I reject this conclusion because the Garibaldi Study analysis of expansion potential is flawed. Due to a mistake in their reading of the applicable zoning ordinance, the consultants to Garibaldi assumed that four-story buildings could be constructed. Reducing the building height to the three stories actually permitted by the zoning ordinance would reduce the area of potential additional office space to approximately 1,000,000 square feet in the same building locations as set forth in the Garibaldi Study.
Defendant’s appraiser acknowledged that the Garibaldi Study improperly assumed four-story buildings, but concluded that an additional building could be located on the site without exceeding the maximum lot coverage permitted by the zoning ordinance, so that 1,400,000 square feet could be built even with three story buildings. I reject this conclusion. Defendant’s appraiser did no engineering study in connection with his analysis. Determining the feasibility of constructing a building in addition to the five described in the Garibaldi Study involves considerations beyond whether the maximum lot coverage provision of the zoning ordinance would be satisfied. Engineering studies would be necessary to ascertain where the building could be located, whether proper access could be provided, whether utility connections would be feasible, and whether soil conditions would permit construction of such a building.
Mr. Blanchard testified that, although the Garibaldi Study indicated that 1,400,000 square feet of additional office space could be built, he believed only approximately 1,000,000 square feet were feasible based on what the market would bear. He further testified that utilities would be adequate and anticipated no other *553 problems with such development other than traffic. He cautioned, however, that such development was not likely or foreseeable in the short term and would take up to ten years to complete. Mr. Blanchard’s testimony on this subject was supported by Martin Gross, an appraiser and engineer, whose testimony was offered to refute the conclusion by defendant’s appraiser that 1,400,000 square feet of additional office space could be constructed on the site. I disregard most of Mr. Gross’s testimony because he misunderstood, or mischaraeterized, or both, the assumptions underlying the opinion of defendant’s appraiser and because Mr. Gross’s assumptions as to the timing of construction were wholly unsupported. His testimony, however, did corroborate Mr. Blanchard’s opinion that the market would not support immediate massive development of additional office or office/research space on the subject property.
In support of his opinion that construction on the subject property of 1,400,000 square feet of new office/research space was feasible, defendant’s appraiser studied new construction in the general area of the property from 1990 to 1997, and determined that new buildings, or expansion of existing buildings, occurred or was occurring on fifteen properties in twelve different municipalities. Some of this construction was for warehouse or production use. The largest expansion projects were performed by owner-occupants, and no project exceeded 400,000 square feet. Only two of the projects were located in Wayne, one of which involved a 40,000 square foot expansion and the other a 275,000 square foot expansion.
The appraiser drew no conclusion from this study, nor did he make any other study, as to specific market demand for, and the time period required to lease, the 1,400,000 square feet of space he assumed could, and would, be constructed on the subject property. His study demonstrates only that a small number of property owners, scattered throughout a smaller number of municipalities, were engaged in expansion of existing facilities and some construction of new facilities. The study does not, however, provide an estimate of market demand for additional office/research space at *554 the subject property and, therefore, fails to demonstrate existing market demand in Wayne, as of October 1, 1995, for land suitable for immediate development with 1,400,000 square feet of offiee/research space. See Market Analysis for Valuation Appraisals, supra at 135-49 (describing the preparation of a market demand study).
Based upon the foregoing, I conclude that: (i) the future construction which should be included in the highest and best use of the subject property is 1,000,000 square feet of office/researeh space, (ii) such construction would not commence for three to five years after October 1,1995, and (iii) such construction will require ten years from October 1,1995 for completion.
Ill
Valuation
A. General.
I turn now to valuation of the property. Plaintiffs appraiser used the cost, income, and comparable sales approaches in his valuation analysis, and considered the sale of the subject property, in February 1997, as corroboration for his value determination of $11,810,000 (exclusive of Lot 1 in Block 4200 to which the appraiser assigned a value of $1,190,000). Defendant’s appraiser used only the cost and income approaches, rejected the sale of the subject property as a value indicator, but considered some improved sales as corroboration for his value determination of $83,-000,000.
The appraisers agreed that, in order to be competitive in the market, the Main Building required significant renovation and rehabilitation, and the West Braiding required some renovation. They also agreed that additional expenditures for interior improvements related to tenant occupancy were necessary to place the buildings, particularly the Main Building, in rentable condition. In their respective income approaches, the appraisers deducted renovation, rehabilitation, and interior improvement costs. They derived their deductions for renovation and rehabilitation costs *555 from the Garibaldi Study, with plaintiffs appraiser deducting multi-tenant costs of $19,626,366, and defendant’s appraiser deducting single-user costs of $16,540,985 (with adjustments discussed below).
With respect to interior improvement costs, plaintiffs appraiser deducted from his income approach value the sum of $9,226,220, which he described as costs of tenant fit-up. This amount represented $20 per square foot for the Main Building and $10 per square foot for the West Building. Defendant’s appraiser determined that the full cost of interior improvements, including all tenant fit-up, would be $18,625,000, but that only one-half of that amount, or $9,312,500 (adjusted as discussed below), should be deducted. This amount represented the cost of providing a basic interior finish to the buildings, with the other $9,312,500 attributable to a landlord’s normal obligations to satisfy individual tenant needs and requirements.
In their respective cost approaches, the appraisers reflected renovation, rehabilitation, and interior improvement costs in their depreciation analyses. Defendant’s appraiser used the Garibaldi Study single-user costs (as adjusted) and his basic tenant finish costs (as adjusted) as components of depreciation. Plaintiffs appraiser did not use the Garibaldi Study costs or his tenant fit-up costs in his depreciation analysis, and determined physical depreciation and functional obsolescence independently. His deduction for these two items totalled $47,179,768 ($36,070,944 for physical depreciation and $11,108,824 for functional obsolescence) and, in effect, incorporated the appraiser’s estimated renovation, rehabilitation and tenant fit-up costs.
Defendant’s appraiser made two adjustments to the Garibaldi Study single-user costs. The first was a subtraction of $3,529,090, which the appraiser described as an amount related to “capital expenses or tenant expenses” for items such as chillers, boilers, and elevators. The appraiser’s second adjustment was an increase resulting from application of an overhead and entrepreneurial profit factor of 15% (allocated, by the appraiser, 5% to overhead and 10% to entrepreneurial profit). These adjustments produced *556 net renovation and rehabilitation costs to be deducted in the amount of $14,963,679. Defendant’s appraiser also increased his interior improvement (basic tenant finish) costs by the 15% overhead and entrepreneurial profit factor, resulting in a total amount for these costs of $10,709,375. Accordingly, the appraiser’s total deduction for renovation, rehabilitation, and interior improvement costs, in both his income and cost approaches, was $25,675,000 (rounded).
Based upon my determination of highest and best use, I conclude that any deduction, in either the income or cost approach, based on the Garibaldi Study renovation and rehabilitation costs should employ the single-user costs. I reject, as inappropriate, the subtraction by defendant’s appraiser of $3,529,090 from the Study costs. In concept, and in the context of the renovation and rehabilitation work, the items included in the subtracted amount are indistinguishable from new windows or basic tenant finish, the cost of which defendant’s appraiser treated as fully deductible.
With respect to interior improvement costs related to tenant occupancy, I accept the theory of the deduction articulated by defendant’s appraiser. The cost of improvements to satisfy specific requirements of individual tenants are not properly part of the cost of placing a building in rentable condition and, therefore, cannot be deducted dollar-for-dollar from a value otherwise determined. In the income approach, such costs may be included in the expense for replacement reserves. See Appraisal Institute, The Appraisal of Real Estate 496 (11th ed.1996) (stating that where, in the applicable market, landlords are required to perform interior tenant improvement work in order to achieve market rent, the cost of such work “should be included in the reconstructed operating statement as part of the replacement allowance”). Basic tenant finish costs are part of the cost of placing the building in rentable condition, and are, therefore, an appropriate dollar-for-dollar “bottom line” deduction. See Pine Plaza Assocs., L.L.C. v. Hanover Tp., 16 N.J.Tax 194, 217-18 (Tax 1996) (allowing deduction of the cost of “vanilla box” improvements to retail space).
*557 In the context of my cost approach analysis below, I will discuss the 15% allowance by defendant’s appraiser for overhead and entrepreneurial profit. Subject to such discussion, my determination of the value of the subject property will incorporate the foregoing conclusions. In making that determination I will consider the appraisers’ valuation approaches in the following order: first, the comparable sales approach used by plaintiffs appraiser; second, the cost approach used by each appraiser; third, the income approach used by each appraiser; and, fourth, the corroborative evidence considered by each appraiser.
B. Comparable Sales Approach.
In his comparable sales approach, plaintiffs appraiser considered two transactions: the September 1996 sale of an IBM property in Franklin Lakes, New Jersey, and a September 1994 listing of a Prentice Hall property in Englewood Cliffs, New Jersey. I give very little weight to this approach for the following reasons.
The IBM building sold for multi-tenant use, which is different from the highest and best use for the subject property. Accordingly, the sales price may not be indicative of the value of the subject property. See The Appraisal of Real Estate, supra at 303 (stating that the highest and best use “should be the same or similar for each comparable property as for the subject property”). See also Newport Center v. Jersey City, 17 N.J.Tax 405, 418-25 (Tax 1998) (excluding from evidence sales having highest and best uses so dissimilar to the highest and best use of the subject property as to render the sales of no assistance to the court in valuing the subject property). Furthermore, plaintiffs appraiser never saw the contract for the sale, and had no knowledge of the financing terms and very little knowledge about the other essential terms of the transaction. The property was totally vacant when sold, and had been vacant for four years. This depressed the sales price. Peter Blanchard confirmed that a building has a higher value when occupied than when vacant. Plaintiffs appraiser acknowledged that the buyer was “looking at *558 all costs that they’re going to absorb until it gets up to stabilized occupancy.” Finally, the appraiser’s adjustments to the IBM sale totalled fifty percent. The quantum of these adjustments alone vitiated the comparability of the sale. See M.I. Holdings, Inc. v. Jersey City, 12 N.J.Tax 129, 137 (Tax 1991).
Even plaintiffs appraiser did not rely on the Prentice Hall listing. The appraiser described, but did not quantify, his adjustments to the listing, and stated in his appraisal report that he regarded the IBM sale “as more relevant than Prentice Hall.” The Prentice Hall property comprised a building containing 307,162 square feet of Class B office space and 86,160 square feet of warehouse, located on a land area of 27.03 acres. The subject property, as described by plaintiffs appraiser, included the West Building with high Class A office space and the Main Building which, after renovations, would contain Class A or Class B + office space. No portion of either of the buildings was, or would be, used for warehouse space. Finally, the subject land area is approximately seven times the area of the Prentice Hall site. In short, the Prentice Hall property is too dissimilar to the subject property in too many significant respects to qualify as a comparable.
C. Cost Approach.
Defendant’s appraiser gave equal weight to the cost and income approaches in his valuation conclusion. Plaintiffs appraiser described the cost approach as “very important” in valuing property such as the subject, even though plaintiff argued in its post-trial brief that the cost approach should not be considered. This approach is not the methodology which would predominate in the marketplace for valuing property, such as the subject property, with income producing potential. See University Plaza Realty Corp. v. City, of Hackensack, 12 N.J.Tax 354, 366 (Tax 1992), aff'd, 264 N.J.Super. 353, 624 A.2d 1000 (App.Div.), certif. denied, 134 N.J. 481, 634 A.2d 527 (1993); Shav Assocs. v. Middletown Tp., 11 N.J.Tax 569, 578-79 (Tax 1991); The Appraisal of Real Estate, supra at 449. In addition, for buildings of the ages of the *559 subject buildings, depreciation is generally difficult to measure, resulting in possible distortion of the cost approach value. See J .C. Penney Co. v. Lawrence Tp., 8 N.J.Tax 473, 479 (Tax 1986), aff'd. o.b., 9 N.J.Tax 635 (App.Div.1987), and Congoleum Corp. v. Hamilton Tp., 7 N.J.Tax 436, 443 (Tax 1985) (both of which discuss concerns as to the reliability of the cost approach when used to value older buildings). I conclude that the income approach should be the primary basis for valuation of the subject property. I will, however, consider and analyze the cost approaches of the two appraisers because, here, an owner-occupant is a potential purchaser of the property, and, in the absence of adequate comparable sales data, such a purchaser may evaluate the property on the basis of the cost approach. Consequently, the cost approach provides a meaningful secondary basis for valuation.
The appraisers employed different methodologies for determining reproduction cost, although each derived his costs from Marshall Valuation Service. Plaintiffs appraiser used the segregated cost, or unit-in-place, method which is described as follows:
In the unit-in-place, or segregated cost, method unit costs for various building components as installed are applied to the number of components in the structure or to linear, area, volume, or other appropriate measures of these components. Using this method the appraiser computes a unit cost based on the actual quantity of materials used plus the labor of assembly required for each square foot of area.
[The Appraisal of Real Estate, supra at 355.]
Defendant’s appraiser used the calculator, or comparative-unit method, which is described as follows:
The comparative unit method is used to derive a cost estimate in terms of dollars per unit of area. The method employs the known costs of similar structures adjusted for market conditions and physical differences. Indirect costs may be included in the unit cost or computed separately.
[Id. at 352.]
Without regard to methodology, the reproduction cost analysis of plaintiffs appraiser is significantly more detailed, and based upon more precise information as to the size of the subject buildings and their various components, than the information used by defendant’s appraiser. Accordingly, I accept the reproduction cost, before depreciation, as determined by the plaintiffs appraiser, with modifications as discussed below. This cost is $77,711,692 *560 ($69,857,942 for buildings plus $7,853,750 for site improvements) as compared to $77,007,266 ($71,419,623 for buildings plus $5,587,-643 for site improvements) determined by defendant’s appraiser.[2] The defendant’s appraiser, however, increased his reproduction cost by a factor of 5% of such cost for overhead, and by a factor of 10% of such cost plus overhead for entrepreneurial profit. This produced a total reproduction cost of $88,943,392 ($82,489,664 for buildings and $6,453,728 for site improvements). Plaintiffs appraiser did not include any factor for overhead or entrepreneurial profit. He opined that the cost items represented by the 5% overhead factor were already included in his reproduction cost, and that, because of the weak conditions in the office market (as reflected in his analysis of external obsolescence), there could be no entrepreneurial profit.
The subject of entrepreneurial profit or entrepreneurial incentive is described in The Appraisal of Real Estate as follows:
Entrepreneurial incentive is a market-derived figure that represents the amount an entrepreneur expects to receive as repayment for his expenditure (direct and indirect costs) and as compensation for providing coordination and expertise and assuming the risks associated with the development of a project. Entrepreneurial profit is the, difference between total cost of development and marketing and the market value of a property after completion and achievement of stabilized occupancy. Entrepreneurial incentive is what motivates an entrepreneur — the reward the entrepreneur anticipates receiving. The frame of reference for entrepreneurial incentive is forward-looking. The amount the entrepreneur actually achieves by the end of the development and marketing periods is entrepreneurial profit. The frame of reference for entrepreneurial profit is backward-looking.
If the cost of developing a properly is used to provide an indication of value, the appraiser must recognize the contribution of the entrepreneur and consider the inclusion of entrepreneurial profit in addition to direct and indirect costs. An entrepreneur pays no more for land and improvements than is needed to provide an appropriate profit on the specific project. If realizing a profit does not appear feasible, the entrepreneur will not proceed with the project. This does not mean that the entrepreneur is guaranteed a reward for his or her efforts. Expenditures do not guarantee value. There is no certainty that any component of cost will create commensurate value, and the residual nature of an entrepreneurial reward makes it far from certain. Nevertheless, entrepreneurship represents a legitimate cost of development and should be included in the estimate of development cost.
*561 [The Appraisal of Beal Estate, supra at 347-48.]
Based upon the foregoing statement, I conclude that a factor for entrepreneurial profit should initially be included in the cost approach analysis for the subject property, although the impact of such factor could be nullified by a later deduction for external obsolescence attributable to weak market conditions. Cf. Texas Eastern Transmission Corp. v. East Amwell Tp., 13 N.J.Tax 24, 40-42 (Tax 1992) (discussing the relationship between entrepreneurial profit and market conditions). This conclusion does not resolve the issue of what the amount or percentage of entrepreneurial profit should be. Defendant’s appraiser provided minimal support for his selection of 10%. The Tax Court has previously recognized that entrepreneurial profit ranging from 5% to 10% should be included in the cost approach. See, e.g., Beneficial Facilities Corp. v. Peapack & Gladstone Bor., 11 N.J.Tax 359, 381 (Tax 1990); aff'd 13 N.J.Tax 112 (App.Div.), certif denied, 130 N.J. 397, 614 A.2d 619 (1992) McGinley Mills, Inc. v. Town of Phillipsburg, 9 N.J.Tax 508, 517 (Tax 1988).
Defendant’s appraiser allocated 5% to overhead on the basis that the reproduction costs set forth in Marshall Valuation Service do not contain the following general categories: costs of buying and assembling the land, soil compaction, land planning and taxes, discounts or bonuses paid for financing, site improvements, off-site costs, furnishings and fixtures for tenants, and marketing costs to create first occupancy. Plaintiff’s appraiser, as noted above, opined that these costs were included in his reproduction costs. I am satisfied that such costs are not included in the Marshall Valuation Service costs used by either appraiser, but I conclude that 5% of reproduction cost is an excessive amount for overhead. Five percent of the $77,007,266 reproduction cost determined by defendant’s appraiser is approximately $3,850,000. Defendant’s appraiser provided no dollar estimates of the actual cost of the above-described overhead items. Furthermore, certain of the items are not applicable to the subject analysis. Both appraisers separately determined site costs; neither appraiser discussed a discount or bonus paid for financing; costs for tenant furnishings *562 and fixtures and marketing costs are not includable in valuing the subject property for tax assessment purposes.
Because of the lack of definitive support for the 5% for overhead and 10% for entrepreneurial profit increments (or for the combined 15% increment) used by defendant’s appraiser, and because I conclude that entrepreneurial profit and some overhead should be included, I will allow a unitary factor of 10% to cover both overhead and entrepreneurial profit. Adding this 10% factor to the reproduction cost of $77,711,692, determined by plaintiffs appraiser, results in a total reproduction cost of $85,482,861 ($76,-843,736 for buildings plus $8,639,125 for site improvements).
The two most significant differences between the appraisers’ respective reproduction cost analyses are: (a) depreciation and (b) land value. Plaintiffs appraiser used the breakdown method of determining depreciation which “disaggregates a total depreciation estimate into its component parts” of physical depreciation, functional obsolescence, and external obsolescence. The Appraisal of Real Estate, supra at 378-79. He determined that the appropriate physical depreciation factors were 33.33% for the structural components of the Main Building, and 16.67% for the structural components of the West Building. For the non-structural components, he determined physical depreciation of 80% for the Main Building, and 48% for the West Building. Applying these percentages to the reproduction costs for the structural and non-struetural components of each building determined by plaintiffs appraiser (without inclusion of 10% entrepreneurial profit and overhead) results in physical depreciation of $36,070,944. The appraiser also determined that the functional obsolescence of the buildings totalled $11,108,824 (net of physical depreciation previously deducted). This functional obsolescence related to the elongated serpentine shape of the Main Building, the single pane windows in the Main Building, the obsolete HVAC system, the lack of sprinklers, asbestos contamination, and inadequate elevators. The total physical depreciation and functional obsolescence attributable to the buildings, therefore, was $47,179,768. Finally, the appraiser determined that the site improvements suffered 72% *563 physical depreciation or $5,654,700. His total physical depreciation and functional obsolescence was $52,834,468. Subtracting this amount from the appraiser’s reproduction cost of $77,711,692 leaves a depreciated cost of $24,877,224. From this amount, plaintiffs appraiser subtracted external obsolescence of 84%, or an additional $20,896,868, resulting in aggregate depreciation of $73,-731,336, and leaving a total improvement value of $3,980,356, or approximately $7.28 per square foot of gross rentable building area.
Defendant’s appraiser did not segregate the components of his depreciation analysis, and determined building depreciation from all causes of $38,048,453. This amount included renovation and rehabilitation costs (including 15% overhead and entrepreneurial profit) of $14,963,679 plus basic tenant finish costs (including 15% overhead and entrepreneurial profit) of $10,709,375, for a total of $25,675,000 (rounded). To this amount the appraiser added 15% of his total building reproduction cost including 5% for overhead and 10% for entrepreneurial profit ($82,489,664), producing additional depreciation of $12,373,450. He explained such additional amount as reflecting the inability of the subject renovated buildings to achieve the same rents as new buildings. The appraiser supported his selection of 15% by assuming an economic life for both buildings of sixty years, averaging their actual ages (thirty-four years for the Main Building and nineteen years for the West Building, for an average of 26.5 years), and then determining that the Marshall Valuation Service depreciation tables showed a 15% depreciation factor for a twenty-six year old building. The appraiser depreciated site improvements by 75% of his reproduction cost of $6,453,728 (including 5% for overhead and 10% for entrepreneurial profit), producing depreciation of $4,840,296. His aggregate depreciation was, therefore, $42,888,746.
The aggregate amount of physical depreciation and functional obsolescence determined by plaintiff’s appraiser substantially exceeds the costs of renovation, rehabilitation, and basic tenant finish as estimated by both appraisers. The renovation, rehabilitation, and tenant finish work, however, could not cure all items of *564 physical depreciation or functional obsolescence. As a result, a certain amount of depreciation in excess of these costs is appropriate. Defendant’s appraiser presumably addressed this issue in his additional depreciation of 15% of his reproduction cost. I conclude that such 15% factor is inadequate. One element of such inadequacy results from the appraiser’s failure to weight the ages of the two buildings by size. Such weighting produces a higher average age (approximately thirty years), and a correspondingly higher depreciation percentage. On the other hand, the amount of physical-depreciation and functional obsolescence applicable to the buildings determined by plaintiff’s appraiser, $47,179,767, is excessive. Such amount is nearly two and one-half times the appraiser’s $19,626,366 estimate of renovation, rehabilitation, and tenant fit-up costs (for multi-tenant use). The $27,553,401 excess over such renovation, rehabilitation, and tenant fit-up costs equals approximately 39% of the appraiser’s reproduction cost for the buildings, as compared to the 15% of reproduction cost used by defendant’s appraiser.
I conclude that the appropriate deduction for physical depreciation and functional obsolescence should be the sum of the following:
(a) $18,195,084, representing the costs of renovation and rehabilitation of the buildings for single-user occupancy as estimated in the Garibaldi Report ($16,540,985), increased by 10% for overhead and entrepreneurial profit; plus
(b) $10,243,750, representing the costs for basic tenant finish as determined by defendant’s appraiser ($9,312,500), increased by 10% for overhead and entrepreneurial profit; plus
(e) $19,210,934 representing 25% of building reproduction costs as determined by plaintiff’s appraiser and increased by 10% for overhead and entrepreneurial profit ($76,843,736); plus
(d) $6,220,170 representing 72% of site improvement costs as determined by plaintiff’s appraiser and increased by 10% for overhead and entrepreneurial profit ($8,639,125).
The aggregate deduction is, therefore, $53,869,938. Subtracting this amount from $85,482,861 leaves a reproduction cost after physical depreciation and functional obsolescence of $31,612,923.
From this depreciated cost plaintiffs appraiser would make an additional deduction of 84% for external obsolescence. I reject *565 this deduction. Plaintiffs appraiser used two techniques to calculate and support the deduction. One technique was based on a capitalization of rent loss resulting from excess vacancy at the subject property caused by weak market conditions. This technique is recognized by The Appraisal Institute. The Appraisal of Real Estate, supra, at 393-94. The other technique involved an analysis of the difference between the return on equity, after debt service and operating expense payments, which the appraiser calculated would be required by the market, and the return on equity available based on the appraiser’s income approach valuation for the subject property. I find that both of these techniques are flawed, and neither provides a basis for the external obsolescence deduction.
In his capitalization of rent loss analysis the appraiser assumed a gross rent per square foot of $24. He then determined income remaining after deduction of: (i) a 10% vacancy allowance (which reflected stabilized vacancy at the subject property), (ii) operating expenses of $6.50 per square foot, (iii) property taxes of $1.50 per square foot, and (iv) debt service of $10.97 per square foot. He calculated debt service by assuming a value of $145 per square foot, a mortgage loan to value ratio of 75%, and a mortgage constant of 10.09%. He determined the $145 per square foot value by capitalizing, at 9.38%, net operating income of $13.60 per square foot ($24 less deduction of a 10% vacancy allowance and $8 in operating expenses and property taxes). The foregoing computations produced remaining income of $2.63 per square foot. The appraiser then determined income remaining after deduction of 20% vacancy allowance (which, based on his view of market conditions, reflected probable actual short-term vacancy at the subject property), and deduction of reduced operating expenses and taxes (based on higher vacancy) of $6.30 per square foot and $1.30 per square foot, respectively. After assuming the same debt service as used in his first calculation, the appraiser determined remaining income of $.68 per square foot, which is 74% lower than $2.63 per square foot. He concluded that he had demonstrated 74% external obsolescence.
*566 The appraiser’s capitalization of rent loss analysis is flawed and unreliable. First, the appraiser failed to explain his use of a rent of $24 per square foot. In his income approach, he determined rents for the subject buildings of $19 and $21 per square foot. Second, a 20% vacancy and collection loss allowance (taken from the appraiser’s income approach) is inappropriate because: a) the vacancy studies upon which such percentage is based are not sufficiently particularized as to the type, character, and quality of space available at the subject property; and b) the appraiser’s selection of this percentage was influenced by the very large vacancy he anticipated until initial lease-up occurred. This latter consideration is inconsistent with the stabilized vacancy premise of tax appeal valuation. Third, the appraiser, without explanation, used operating costs higher than the $6 per square foot appearing in his income approach. Fourth, the appraiser assumed, without explanation, a 75% loan-to-value ratio. This is higher than the ratio I have determined to be appropriate in my income approach analysis. Fifth, the appraiser, without explanation, used a 9.38% basic capitalization rate and not the 10.5% basic capitalization rate he used in his income approach. Finally, the appraiser assumed that the financing available for a building having a projected 20% vacancy factor would be the same as that available for a building having a projected 10% vacancy factor. This assumption is incorrect. When the proper assumption is made, that is, that financing will vary based on projected vacancy and resulting income, the external obsolescence demonstrated (without changing any other component of the appraiser’s analysis) is not 74% but approximately 14%. This differential itself suggests the unreliability of the analysis.
In addition to its foregoing defects and deficiencies, the capitalization of rent loss analysis by plaintiffs appraiser seems inapplicable in a tax appeal valuation context, where the object is to determine stabilized value. In tax appeal valuation, only a stabilized vacancy factor is used in the income approach, regardless of what actual market conditions might reflect as of the date of valuation. See University Plaza Realty Corp. v. City of Hackensack, supra, 12 N.J.Tax 354. See also Hull Junction Holding *567 Corp. v. Princeton Bor., 16 N.J.Tax 68, 96 (Tax 1996). Consequently, a short-term non-stabilized vacancy factor would be inappropriate to demonstrate external obsolescence applicable to a long-term stabilized value.
In his analysis based on available return on equity, plaintiffs appraiser assumed a property value of $67,499,487, which consisted of: (i) land value of $8,500,000 for eighty five acres, (ii) a reproduction cost for buildings and site improvements, after physical depreciation and functional obsolescence, of $30,146,901, and (iii) renovation, rehabilitation, and tenant fit-up costs of $28,852,-586. He multiplied $67,499,487 by the capitalization rate (including a tax factor) of 12.8% used in his income approach discussed below, and determined that, in order to support such value, the marketplace would require income of $8,639,934. He then assumed 75% financing ($50,624,615), with a mortgage constant of 10.09%, resulting in annual debt service of $5,108,024. This left $3,531,910 as a return on equity. In his income approach, the appraiser determined that the total income generated by the property would be $5,320,381. After payment of the debt service of $5,108,024, only $212,357 is available as a return on equity which represents a 94% decrease from the market requirement as calculated by the appraiser. He equated such decrease with external obsolescence.
A return on equity analysis is not discussed, described, or recognized in The Appraisal of Real Estate, supra. Even if the analysis were recognized and accepted, its application by plaintiffs appraiser is as flawed and unreliable as his capitalization of rent loss analysis. First, the appraiser provided no basis for his assumption that eighty five acres are required to support the subject buildings. Second, the appraiser provided no explanation for his use of a depreciated improvement cost of $30,146,901 when his cost approach (without correction for stipulated building areas) showed a depreciated improvement cost of only $24,431,901. Third, in determining the dollar amount of total income required by the market and the portion of that income required for debt service, the appraiser based his calculations on a property value *568 substantially higher than his income approach value. The appraiser’s income approach indicated a value for the property, after renovation of the buildings, of $41,137,408 not $67,479,487. Accordingly, based on the appraiser’s income approach value, income of $8,639,939 reflects a capitalization rate of 21% not 12.8%, and the principal amount of his assumed mortgage loan represents 123%, not 75%, of property value. Fourth, the appraiser’s assumed 75% financing is, as discussed above, excessive. Fifth, the appraiser used a mortgage constant of 10.09% without any explanation or support. Sixth, the analysis included a 20% vacancy and collection loss allowance, which, as discussed above, is excessive. Finally, the appraiser’s 12.8% capitalization rate included a basic rate of 10.5%, not the 9.38% rate he used in his capitalization of rent analysis. The appraiser provided no explanation for this difference. Moreover, a 10.5% rate is in excess of the rate which I conclude is appropriate as set forth below in my income approach discussion.
Plaintiff has failed to establish a basis for deduction of external obsolescence.[3] Accordingly I will make no such deduction, thus leaving the depreciated reproduction cost of the improvements on the subject property at $31,612,923.
The remaining issue in the cost approach is the land value which must be added to the depreciated reproduction cost of the buildings. Plaintiffs appraiser valued the land on a per acre basis. However, plaintiffs witness, Peter Blanchard, opined that land value for office purposes is a function of buildable area. Indeed Mr. Blanchard testified that “dollars per acre are meaningless” and that, for real estate such as the subject property, value is based on “what I can build, — FAR [floor area ratio] ... that’s the value.” Mr. Blanchard’s opinion is consistent with that of defendant’s appraiser. I conclude, therefore, that land value for the subject property is a function of buildable area. As described *569 above in my discussion of highest and best use, I have concluded that the total buildable area on the property is 1,546,448 square feet consisting of the gross rentable area of the existing buildings (as stipulated by the parties) plus 1,000,000 square feet of future construction of office/research space.
In determining land value, both appraisers relied on the comparable sales approach. Plaintiffs appraiser considered four sales which he analyzed based on sales price per acre. His Sale No. 1, in Hanover Township, Morris County, New Jersey, contained 14.47 acres and was purchased for hotel use. His Sale No. 2, in Bridgewater, Somerset County, New Jersey, contained 44.64 acres and was purchased with “no immediate plans to develop,” although a prior plan for 525,000 square feet of office space had been submitted but withdrawn before approval. Assuming that 525,000 square feet could be constructed on this property, the sales price reflects $12.76 per square foot of buildable area. Sale No. 3 used by plaintiffs appraiser was a 64.78 acre property in Florham Park, Morris County, New Jersey, approved for a 551,900 square foot office building. This sale, however, also involved the purchase of two large buildings. The 64.78 acres was excess land included in the transaction. The aggregate purchase price was $84,000,000, of which, according to the appraiser, $8,000,000 was “reported” to be allocated to the vacant land. The appraiser had no knowledge of the basis for the allocation. This sale reflected $14.50 per square foot of buildable area. The fourth sale used by plaintiffs appraiser involved a 40.71 acre property in Parsippany-Troy Hills, Morris County, New Jersey. The property was purchased to be improved with an office-warehouse complex of which 64% of the improvement would be warehouse space.
As the preceding description reveals, Sales Nos. 1 and 4 were for a highest and best use significantly different from that of the subject property, and, therefore, are not sufficiently comparable to the subject property to provide meaningful information. I give little weight to these sales. I also give little weight to Sale No. 3, because I cannot determine whether the portion of the purchase price allocated to land reflected fair market value.
*570 Defendant’s appraiser relied on five sales, most of which involved purchases for immediate development with expansion potential. He analyzed the sales based on sales price per square foot of buildable area including expansion potential. The appraiser’s Sale No. 1 was a 46.13 acre property in Madison, Morris County, New Jersey. The sale reflected a price of $15.85 per square foot of buildable area, which area included 489,820 square feet initially approved and 112,680 square feet of expansion potential. His Sale No. 2, a 20 acre parcel also located in Madison, reflected $24.63 per buildable square foot for property purchased for immediate development of a 203,000 square foot speculative office budding. His Sale No. 3, a 153.68 acre property located in Mount Olive, Morris County, New Jersey, reflected $18.24 per buildable square foot for property purchased by a corporate user intending to develop 918,000 square feet of office space immediately with preliminary approval for an additional 782,000 square feet of office space. The appraiser’s Sale No. 4, a 12.26 acre parcel in Mountain Lakes, Morris County, New Jersey, was purchased for development with a 62,407 square foot offiee/processing/distribution facility which could be expanded to 82,704 square feet. This property is substantially smaller than the subject property and has a dissimilar highest and best use from the subject property. Accordingly, I give this sale, which reflects $26.97 per square foot of buildable area, little weight. The last land sale considered by defendant’s appraiser was a 40.71 acre parcel in Parsippany-Troy Hills, and is the same sale as Sale No. 3 used by plaintiffs appraiser. For the reasons set forth above, I give this sale little weight.
From his comparable sales, defendant’s appraiser concluded that the appropriate land value for the subject property was $20 per square foot of existing and potential buildable area, or $39,-000,000 (1,950,000 square feet x $20). The appraiser provided no information, however, as to whether the sales price for each sale in fact reflected the same amount for all land, or a higher amount for immediately developable land and a lower amount for the balance. Consequently, neither the appraiser’s appraisal report nor his testimony supported his conclusion that purchasers in the market *571 place will pay the same amount per square foot of buildable area for land to be developed immediately as they will pay for land to be developed in the future. “To reflect value accurately, comparable sales must have a similar use potential and similar timing for that use.” Market Analysis for Valuation Appraisals, supra at 342.
I conclude, based primarily on Sale No. 2 ($12.76 per square foot) used by plaintiffs appraiser and Sales Nos. 1 ($15.85 per square foot), 2 ($24.63 per square foot) and 3 ($18.24 per square foot) used by defendant’s appraiser, that $20 per square foot of buildable area is an appropriate market value for land to be developed immediately. Applying this amount to the existing 546,448 square feet of gross rentable area on the subject property, produces a land value relating to that space of $10,928,960, which I will round to $11,000,000. The remaining land, suitable for future construction of an additional 1,000,000 square feet of office/research space, has a lower value.
In my highest and best use analysis, I concluded that construction of such 1,000,000 square feet will not commence for three to five years after the October 1, 1995 valuation date, and will require ten years after such date for completion. If I:(a) assume that over such ten year period the value of land for immediate development will remain at $20 per buildable square foot (the record provides no basis to project appreciation or depreciation), (b) assume that construction will begin within five years and be completed within ten years, and (c) discount $20 per square foot to present value over a five year period and a ten year period, using as discount rates the third quarter 1995 average internal rates of return for the national suburban office market as shown in the Korpacz Real Estate Investor Survey (12.09%), and in the Real Estate Research Corporation Real Estate Report (11.8%), I calculate a value range of approximately $6.50 to $11.50 per buildable square foot. Land Sale No. 2 used by plaintiffs appraiser indicated a value per buildable square foot of $12.76 for land purchased for future development. As adjusted by plaintiffs appraiser, the sale reflects $9.19 per square foot of buildable area, and, reflects *572 $11.00 per square foot, after elimination of the appraiser’s adjustment for location (see footnote 1 above). I conclude that the value of the expansion area at the subject property is $10 per square foot of buildable area, or $10,000,000. Total land value is, therefore, $21,000,000.
The depreciated reproduction cost of the improvements on the subject property, as determined above, is $31,612,923. Adding the land value of $21,000,000 produces a total value for the subject property, under the cost approach, of $52,612,923, which I will round to $52,612,900.
D. Income Approach.
I turn now to the income approach to value. The first step in an income approach is a determination of economic (fair market) rent for the existing buddings on the subject property as of the October 1, 1995 valuation date. Plaintiffs appraiser, using a gross rent approach (which assumes that the landlord pays real estate taxes and all other operating expenses), determined economic rent of $19 per square foot for the Main Building and $21 per square foot for the West Building. Defendant’s appraiser determined that a net rent approach should be used for single-occupant buildings. This approach assumes the tenant pays real estate taxes as well as operating expenses, and the only landlord expenses are for management, reserves, and leasing commissions. The appraiser opined that the economic net rent for both the Main Building and West Building was $15.50 per square foot.
I have determined that the highest and best use for the subject property is for single occupancy of each of the buildings. I conclude, based on the opinion of defendant’s appraiser and the comparable leases discussed below, that a single occupant of an entire large building will pay rent on a net basis. Accordingly, I will determine the appropriate economic net rent for the subject property.
In his rent determination, plaintiffs appraiser included several leases relating to large office properties. The rent payable under each of these leases was on a net basis. The specific rents were *573 $12 per square foot, $15.50 per square foot, $11.85 per square foot, and $14.50 per square foot. The appraiser made no adjustments to these rents. His knowledge of the leases came from other appraisers, and he had not seen any of the leasing documents. I will take this limited knowledge into account in my consideration of these comparables.
Defendant’s appraiser relied on five comparable leases, all involving net rents for large space. In analyzing the leases, the appraiser determined the average rent over the term of each lease, but limited to ten years the portion of the lease included in his averaging. Two of the leases reflected average rents of $13.50 per square foot, one $13.33 per square foot, one $13 per square foot, and one $13.20 per square foot. The appraiser made a positive 15% adjustment to four of these rents, and a positive 20% adjustment to the $13 per square foot rent. He explained his adjustments in his appraisal report as follows:
Comparable # 2 and # 3 [$13.50 and $13.33 per square loot, respectively! were existing tenants that improved the space with a number of high quality finishes, which are not necessarily reflected in the rental rates shown above. Since we are estimating the economic rent based on the completed renovation of the subject, each comparable was given an upward adjustment.
In his testimony, the appraiser further explained that his adjustments were based on his determination that the cost of improving the comparable properties to the condition of the subject buildings after renovation and rehabilitation would be approximately $2 per square foot per year over a ten year lease term.
Plaintiffs appraiser testified that the use by defendant’s appraiser of average rents resulted in a “double dip” which inflated the income approach value determined by defendant’s appraiser. Plaintiff’s appraiser reasoned that: 1) average rent takes into account rent increases over the term of a lease; 2) the capitalization rate in direct capitalization (used by both appraisers) already reflects anticipated appreciation; and 3) as a result, appreciation is improperly considered twice by defendant’s appraiser.
Plaintiffs appraiser is correct in his assertion that the capitalization rate in direct capitalization reflects anticipated appreciation. See The Appraisal of Real Estate, supra at 513 (stating that: “A *574 satisfactory rate of return for the investor and recapture of the capital invested are implicit in the rates or factors applied in direct capitalization because they are derived from similar investment properties with similar expectations as to holding period, pattern of income, and change in value.”). The determination of economic rent by defendant’s appraiser, based on average rents, does not, however, necessarily result in the “double dip” described by plaintiffs appraiser. I must determine economic rent as of the applicable valuation date. Average rents derived from comparable leases may, or may not, indicate economic rent for the subject property as of such date.
The five comparable leases used by defendant’s appraiser indicated an average economic net rent of approximately $18.50 per square foot. As described above, the appraiser made a positive adjustment of $2 per square foot, and determined an economic net rent of $15.50 per square foot. The comparable leases contained the following rent provisions: Lease No. 1, dated December 17, 1993, contained a level rent of $13.50 per square foot for its ten year term; Lease No. 2, dated August 23, 1990, contained a rent of $12.50 per square foot for five years and $14.50 per square foot for the last five years of a ten year term (during which the subject valuation date of October 1, 1995 occurred); Lease No. 3, dated November 1, 1992, contained a rent of $13.50 per square foot for the first five years of a ten year term, and $16.20 per square foot for the second five years, for an average rent of $14.70 per square foot, which average rent reflected only $13.20 per square foot after taking into account $6,500,000 paid by the landlord to the tenant as a lease signing inducement; Lease No. 4, dated October 1, 1995, reflected an average rent over a ten year term of $13 per square foot; and Lease No. 5, dated January 1,1995, reflected an average rent over the first ten years of its twenty year term of $13.20 per square foot.
I conclude that the most reliable economic rent indicators for the subject property are Leases Nos. 1 and 2 used by defendant’s appraiser, which contain net rents in effect as of October 1,1995 of $13.50 and $14.50 per square foot, respectively. Based upon these *575 leases and the other leases used by defendant’s appraiser, and the four net leases used by plaintiffs appraiser, I conclude that economic net rent, as of October 1, 1995, was $14 per square foot for the Main Building and $15.50 per square foot for the West Building. In reaching this conclusion, I reject the positive 15%, or $2 per square foot, adjustment made by defendant’s appraiser as to the Main Building, and accept the appraiser’s dollar amount of rent per square foot as applicable only to the West Building. Both appraisers agreed that the Main Building, even after renovation and rehabilitation, would be inferior to the West Building. Peter Blanchard described the West Building as a “very top quality functional modern office building” and commented that “it’s an extraordinary little building.” Accordingly, if an adjustment of $2 per square foot is applicable to the West Building, such adjustment cannot be equally applicable to the Main Building.
The next element of the income approach is the vacancy and collection loss allowance. Plaintiffs appraiser used 20%, and defendant’s appraiser used 5%. Plaintiffs appraiser testified that 5% to 10% represented a stabilized vacancy and collection loss allowance in the market. He used 20% after reviewing studies such as the Sitar Report, which reported a 20% or higher office vacancy rate in Passaic County, and after considering the time period required for renovation and rehabilitation of the subject buildings and the time period thereafter required to reach stabilized occupancy in the buildings.
The analysis of plaintiffs appraiser overstates the vacancy and collection loss factor. He was unfamiliar with the number, quality, and type (multi-tenant or single occupant) of the buildings included in the Sitar Report and other studies. Such studies contained little information as to vacancy rates for buildings such as the subject buildings. The appraiser’s consideration of the time required for renovation and rehabilitation, and lease-up, is contrary to tax appeal valuation theory, under which, as explained above, property is valued in a stabilized condition as of the applicable assessment date. The 5% allowance used by defendant’s appraiser is understated. Even assuming a single occupant for each of *576 the buildings, so that each building will be either full or vacant, finding a tenant for either the entire Main Building or the entire West Building is likely to take longer than finding a tenant for a smaller amount of space in a multi-tenant building. Accordingly, I. conclude that 10% is an appropriate vacancy and collection loss allowance.
Only defendant’s appraiser analyzed the subject property on a net rent basis. He subtracted expenses of 9% of effective gross income (potential gross income minus the vacancy and collection loss allowance). These expenses consisted of 3% for management, 3% for leasing commissions, and 3% for reserves and miscellaneous. Plaintiffs appraiser, using a gross net approach, subtracted operating expenses of $6 per square foot. I accept the expenses used by defendant’s appraiser as reasonable in a net rent analysis. His 3% for reserves and miscellaneous need not be reduced even though (as discussed above in Section III A — Valuation, General) I reject the appraiser’s subtraction of $3,529,090 from the Garibaldi Study costs and deduct the entire renovation and rehabilitation costs determined by the Garibaldi Study for single-user occupancy. The amount of the reserve must be sufficient to cover costs of tenant improvements which the landlord may be required to make. Defendant’s appraiser testified that such costs (including the costs he subtracted from the Garibaldi Study costs) are built into the capitalization rate. Even if he were correct in theory, the appraiser failed to demonstrate that the data upon which he (or plaintiffs appraiser) relied in selecting a capitalization rate included a factor related to tenant improvement costs.
I note that, after subtracting 9% expenses from the economic net rent determined above, the rental amounts remaining are not significantly different from the amounts remaining after deduction of the expenses determined by plaintiffs appraiser from the economic rents determined by him. Plaintiffs appraiser used economic gross rents of $19 and $21 per square foot, and subtracted $6 per square foot in expenses, thereby producing rents, after expenses, of $13 and $15 per square foot. Using net rents of $14 and $15.50 per square foot, and subtracting 9% for expenses, *577 produces rents, after expenses, of $12.74 and $14.10 per square foot.
The next step in the income approach analysis is the selection of a capitalization rate. Plaintiffs appraiser selected 10.5% as his basic capitalization rate, which he indicated was approximately 1% above the rate demonstrated by data compiled by the American Council of Life Insurance and the Korpacz Real Estate Investors Survey. The appraiser added 1% because of the additional risk resulting from non-occupancy. This consideration is inappropriate where (i) property is being valued as if renovated and rehabilitated and as if occupied at a stabilized percentage, and (ii) where the costs of placing the property in rentable condition are subtracted from the income approach value. Defendant’s appraiser selected 9.36% based upon data published by the American Council of Life Insurance, The Real Estate Research Corporation, and Korpacz Real Estate Investors Survey. Use of such data as the basis for selection of a capitalization rate is appropriate. Hull Junction Holding Corp. v. Princeton Bor., supra, 16 N.J.Tax at 82-83.
Plaintiffs appraiser did not explain the selection or components of his capitalization rate beyond the explanation described in the preceding paragraph. Defendant’s appraiser used a band of investment technique in determining his capitalization rate. This technique is more reliable than mere selection of a rate based solely on capitalization rates in published data. See Hull Junction, supra, at 84-85. Consequently, I will select a capitalization rate using the band of investment technique. The components of the analysis by defendant’s appraiser were a mortgage interest rate of 7 .85%, loan to value ratio of 70%, and an amortization period of twenty years. His equity dividend rate was 8%. Based on the data considered by the appraisers, I conclude that a 70% loan to value ratio is appropriate, as is a twenty year amortization period. The interest rate used by defendant’s appraiser, however, is somewhat low based on a comparison of the interest rates in his data with the mortgage constants set forth in such data. The mortgage constants range from 9.8% to 10.2%, indicating underly *578 ing mortgage interest rates ranging from approximately 7.75% to 8.25%. I conclude that 8% is the appropriate mortgage interest component, which, using a twenty year amortization period, produces a mortgage constant of 10.04%. Multiplying this by 70% produces a mortgage component of the capitalization rate of 7.03%. The 8% equity dividend rate used by the appraiser is also somewhat low as reflected in the extracted equity dividend rates in his appraisal report. These rates range from 7.24% to 9.51%. I conclude that 9% is the appropriate equity dividend rate. Multiplying this by 30% produces an equity dividend component of the capitalization rate of 2.7%, for a total rate of 9.73%.
The foregoing analysis can be summarized as follows:
$14.00 x 377,363 square feet ' $5,283,082
$15.50 x 169,085 square feet $2,620,818
Potential Gross Income $7,903,900
Less vacancy and collection
loss allowance of 10% $ 790,390
Effective Gross Income $7,113,510
Less Expenses
Management — 3% of EGI $ 213,405
Leasing Commissions — 3% $ 213,405
Reserves & Mise. — 3% $ 213,405
Total $ 640,215
Net Income $6,473,295
Capitalizing $6,473,295 at 9.73% produces a value of $66,529,239.
From the foregoing amount, the renovation, rehabilitation, and tenant finish costs necessary to place the subject buildings in rentable condition must be subtracted. These costs total $28,438,-834, consisting of $18,195,084 representing the renovation and rehabilitation costs for single-user occupancy as determined in the Garibaldi Study ($16,540,985) increased by 10% for overhead and entrepreneurial profit, plus $10,243,750 representing basic tenant finish costs ($9,312,500 also increased by such 10% factor). The *579 value of the land available for additional development ($10,000,000) must be added. After making these arithmetical calculations, the remaining value for the subject property, under the income approach, is $48,090,405, which I will round to $48,090,400.
E. Corroborative Evidence
As described above, plaintiffs appraiser relied on the sale of the subject property as corroborating his value determination. I reject the use of such sale as indicating or corroborating the value of the subject property for tax assessment purposes for the following reasons:
1. The seller, AHP, was unusually motivated. Mr. Blanchard of Garibaldi testified that, even prior to the closing of AHP’s purchase of American Cyanamid, he was aware that the probability of AHP’s seeking to dispose of the property after the closing was very high. The Garibaldi Study described the property as “redundant.” Mr. Blanchard further testified that, after the proposed sale to Senior Care Living was terminated, in or about July 1996, AHP “wanted to get this [property] off their books.” During the Pall of 1996, Mr. Blanchard recommended to AHP that it sell the property to a “bottom fisher” for approximately $5,000,000 because such a sale would meet AHP’s “initial objective to dispose of the [property] by year end on a non-contingent basis.” Mr. Blanchard testified that, if the offer of approximately $5,000,000 had been submitted a few weeks earlier, AHP probably would have accepted it. AHP’s 1994 Annual Report discusses payment “as quickly as possible” of the debt incurred in connection with acquisition of American Cyanamid by using cash flows from, among other sources, “the sale of non-core... assets.” The subject property was such an asset.
2. The Garibaldi Study, which was the basis for AHP’s marketing strategy and pricing, was prepared when the commercial real estate market was, as described by Mr. Blanchard, “on life support.” The Study notes that the market for properties such as the subject “has been very weak over the past four years; there are no indications that this situation will dramatically change in *580 the near term.”TMs condition of the market affected the recommendations made in the Garibaldi Study, and affected the pricing of the subject property.
8. When marketed, the property was 100% vacant, which undoubtedly depressed the price which could be realized.
4. Although the Garibaldi Study projected a sales price for office use, in a market “on life support,” of $25,000,000 to $30,000,-000, the asking price for the property was only $20,000,000, and the ultimate sales price was $16,000,000 which included 1700 and 1800 Valley Road. $5,000,000 of the sales price was allocated to those two Valley Road buildings, thus indicating a net of $11,000,-000 allocable to the subject property. This allocation was based on an averaging of appraisals of 1700 and 1800 Valley Road performed by two appraisers. These appraisals determined aggregate values for the two buildings ranging from $4,000,000 to $7,400,000. Conceivably, therefore, only $8,600,000 ($16,000,000 minus $7,400,000) of the sales price was attributable to the subject property, a value for the property rejected even by plaintiff’s appraiser.
5. The property was marketed for office use for a very limited period of time and in a limited fashion. As noted above, Garibaldi did not prepare a marketing plan for office use until August 1996. The plan was never implemented, and, on November 6, 1996, sealed bidding packages were forwarded to a small number of prospective purchasers.
6. The mechanics of the sale were not in keeping with traditional market practices. AHP decided to conclude the sale process, and, in order to do so, sent bidding packages to some, but not all, parties who had expressed interest in the property. Each package included a form of Purchase and Sale Agreement, with instructions that the Agreement be signed and returned, with a 10% deposit, within twelve days. There was no opportunity provided for negotiation either as to price or any of the other terms of the Agreement. Changes in the document were expressly “discouraged” and the bidding instructions stated that any changes “shall adversely affect a Bid and may cause a Bid to be *581 disregarded.” In selecting the parties to receive the bidding package, AHP excluded a major participant in the commercial real estate market, because of bad feelings resulting from that company’s exercise of its right to withdraw from a contract to purchase 1700 and 1800 Valley Road.
7. The sale took place in February 1997 based upon a December 1996 contract, well after the October 1, 1995 valuation date at issue in this appeal.
For all of the above reasons, I conclude that the sale of the subject property is of no assistance, even as corroborative evidence, in determining the value of the property for local property tax assessment purposes. See Harrison Realty Corp. v. Town of Harrison, 16 N.J.Tax 375, 381-82(Tax) (finding that the sale of the subject property was not the “best indication of its true value” and noting that “some transactions are more influenced by business decisions than by real estate decisions”), aff'd, 17 N.J.Tax 174 (App.Div.1997), certif. denied, 153 N.J. 213, 798 A.2d 64 (1998).
The comparable sales analysis made by defendant’s appraiser, to corroborate his value determination, requires little comment. The appraiser noted in his testimony that “certain aspects of those sales ... don’t necessarily fit in our model.” The appraiser made no effort to adjust the sales, and, without such adjustments, the sales provide no meaningful indication of the value of the subject property. See The Appraisal of Real Estate, supra at 397, 418 (emphasizing the importance of adjustments in comparative analysis). Consequently, I reject this analysis as providing no guidance as to the value of the subject property.
IV
Conclusion
Although I rely primarily upon the income approach in determining my final value for the subject building, I also gve significant consideration to the cost approach. The income approach indicates a value of $48,090,400, while the cost approach indicates a value of $52,612,900. I conclude that the appropriate value for *582 the subject property, as of October 1, 1995, is $49,500,000. As a result, the ratio of the assessed value to the fair market value of the subject property exceeds 100%, and the Chapter 123 Ratio must be applied. That ratio is 94.84%, producing an aggregate assessment for Lots 1, 2 and 3 in Block 3703 of $46,945,800.
There remains for consideration the appeal with respect to Block 4200, Lot 1. Only plaintiff’s appraiser valued this Lot, and did so based upon a highest and best use for single family residential development as permitted by the applicable zoning ordinance. The valuation attributed to the Lot by the appraiser, of $100,000 per acre, was based on the same land sales as he used to value the land having a highest and best use for office development. None of the sales was for, or in any way related to, residential development, and, therefore, none of the sales was comparable. Accordingly, plaintiff failed to overcome the presumption of correctness which attached to the assessment on Block 4200, Lot 1, and I will enter judgment affirming that assessment at $1,192,400.
In the absence of objection from counsel for either party, I will allocate the aggregate assessment of $46,945,800 on Lots 1, 2 and 3 in Block 3703 as follows, and enter judgments accordingly:
Block 3703, Lot 1 Block 3703, Lot 2 Block 3703, Lot 3
Land $24,156,100 $133,900 $811,500
Improvements $21,768,300 $ 76,000 -0-
Total $45,924,400 $209,900 $811,500
Any objection to the foregoing allocation must be in writing, and must be received by the court with fifteen days of the date of this Opinion.

 In my calculation of these costs, and in all other calculations in my cost approach and income approach analyses (unless otherwise noted), I have accepted and used the parties’ post-trial stipulations as to building areas.

 Perhaps plaintiff s appraiser attributes some external obsolescence to inferior location. As discussed in footnote 1 above, however, plaintiff provided no evidence quantifying the impact of location. Accordingly, external obsolescence relating to this factor is purely speculative.